ALOIS UNTERLACHNER v. ROLLA WELLS, Receiver of United Railways
Company of St. Louis, Appellant. — 296 S. W. 755.

Division One, May 24, 1927.

**1. FORMER APPEAL: Res Adjudicata: Contributory Negligence.** Unless
the record in the second appeal is materially different on the only issue
adjudicated in the first appeal, namely, whether plaintiff's contributory
negligence was as a matter of law a bar to his recovery for personl injuries
alleged to have been caused by defendant's negligent operation of a street
car, that issue is foreclosed.

**2. WITNESS: Jumbled Statements: Contributory Negligence: Matter of
Law.** Where plaintiff at the first trial did not appear to be in a mental
condition to testify and testified to but little as to his movements just be-
fore he was struck by the street car, and at the second trial his mental
state was somewhat improved and he testified at greater length, his jumbled
and contradictory statements as to whether he saw the car coming between
the time he left the sidewalk and started across the street to board it at
the diagonal corner are not sufficient, in the condition he was in, to justify
a ruling, as a matter of law, that he was guilty of such contributory negli-
gence as bars his recovery for his personal injuries.

**3. ——: Street Car: Pedestrian: Right to Assume Ordinance Speed.** A
pedestrian, about to cross a street in front of an approaching street car,
has a right to assume, in the absence of notice or knowledge to the con-
trary, that the car will not run at a speed in excess of the maximum limit
fixed by ordinance, and also to assume that it will stop when signaled to
stop by another person standing at the regular stopping place and desiring
to board it.

**4. ——: ——: ——: ——: Excessive Speed: Stop Signal: Con-
tributory: Crossing Street in Front of Car.** Where plaintiff, at the north-
east corner of the street intersection, saw an eastbound street car ap-
proaching 150 feet west of the west line of the intersecting street and saw
a man at the southwest corner signal it to stop, and started to run diagonal-
ly across the street for the purpose of boarding the car at the southwest
corner. and did not know the speed of the car, although he saw it coming,
but did know that the southwest corner of the intersection was a regular
stopping place, he had a right to assume that it would stop, and, without·
knowledge to the contrary, he had a right to assume that it would not run
in excess of the maximum ordinance limit, which was fifteen miles an·hour;
and there being clear evidence that the car did not stop, but passed up
the regular stop and the man's signal and continued to run at a speed of at
least twenty to thirty miles an hour, and that its northeast corner struck
him, he cannot be held, as a matter of law. to have been guilty of con-
tributory negligence in running the thirty-five or forty feet between the
sidewalk and the north rail of the track on which the car was traveling,
when, if it had been running at the ordinance rate. he would have crossed
in safety, but the question of his contributory negligence, as well as the
question of the defendant's negligence in running in excess of the speed
limit, were questions for the jury.

**5. ——: ——: Instruction: Speed at Place of Accident.** An instruc-
tion which tells the jury that the "ordinance provides that no street car
shall be run at a greater rate of speed than fifteen miles per hour at the
intersection" of the streets, which was but a few feet from the point of

the accident, speaks of the speed at the place of the accident, and is not erroneous because it does not use the words "at the time and place of the accident."

6. WITNESS: Street Car: Pedestrian: Excessive Speed: Knowledge of Pedestrian: Reliance upon Ordinance Speed: Contributory. To run a street car in excess of ordinance speed is negligence per se, and if injury to a pedestrian arises from such negligence defendant is liable, and the question of defendant's negligence is in no wise dependent upon whether the pedestrian knows of the existence of the ordinance. His knowledge is only pertinent as affecting the question of his contributory negligence, and an instruction telling the jury that if the car was being run in excess of the ordinance speed, and if plaintiff did not know it was being so run, he had a right to rely on its not being run at a speed in excess of the ordinance rate, and if in attempting to cross the street in front of it he used ordinary care and expedition, he was not guilty of contributory negligence, is not erroneous.

7. SPEED ORDINANCE: Presumption of Knowledge: Rebuttal: Contributory Negligence. Residents of a city are presumed to know its ordinances, and for all legal purposes the presumption supplies knowledge, whether they actually know them or not, at least until the contrary is made to appear; but in certain instances the presumption may be rebutted, and where knowledge of a speed ordinance is material upon the defense of contributory negligence, it is the duty of a defendant who pleads it to destroy the presumption by producing facts showing that he did not rely upon defendant's observance of the ordinance; otherwise, plaintiff can rely upon the presumption that he knows the ordinance and the further presumption that defendant will obey it and not run its car at an excessive speed. [Disapproving Mockowik v. Railroad, 196 Mo. l. c. 571 et seq.]

8. EXCESSIVE VERDICT: Loss of Ear: Mental Impairment. A verdict for $17,500 is not excessive where plaintiff was twenty-four years of age; was earning $18 per week; for three weeks there was bleeding at the nose and ear, indicating injuries inside the skull; his vision was blurred and double, his eyes shifting and at times appeared crossed, indicating a central nervous system disturbance; there was a large scar over the left parietal eminence and the drum of the left ear was scarified, red, swollen and thickened, and his hearing in that ear was impaired, and remains permanently lost; he was mentally dull, slow-thinking, erratic in his talk and forgot what he had done only a few hours previously; he was numb on the left side; for three weeks he was in a hospital strapped to his bed, and afterwards stayed in bed two months, and for three months more was unable to work at all, and then only "at a boy's job;" and while at the trial, four years after the accident, his general condition and his mental condition have improved, the hearing in the left ear is gone, the numbness in his left side remains, he still has fainting spells, he cannot do valuable work, and his testimony indicates that his mind is still somewhat impaired.

---

Corpus Juris-Cyc. References: Appeal and Error, 4 C. J., Section 3013, p. 1029, n. 30.   Carriers, 10 C. J., Section 1386, p. 973, n. 63; Section 1462, p. 1072, n. 17; Section 1465, p. 1075, n. 32; Section 1474, p. 1081, n. 67; Section 1522, p. 1157, n. 75; Damages, 17 C. J., Section 408, p. 1091, n. 85. Evidence, 22 C. J., Section 85, p. 150, n. 72; Ignorantia juris non excusat, 31 C. J., p. 242, n. 71.   Trial, 38 Cyc., p. 1637, n. 33.

Appeal from Circuit Court of City of St. Louis.—*Hon. H. A. Rosskopf,* Judge.

AFFIRMED.

*T. E. Francis* and *Ernest A. Green* for appellant.

(1) The trial court erred in refusing to give to the jury the peremptory instructions requested by the defendant, both at the close of the plaintiff's case and at the close of all the evidence, and in not peremptorily directing a verdict for the defendant. Under the evidence in the present record the respondent was guilty of contributory negligence, as a matter of law, and the trial court erred in not so instructing the jury. Unterlachner v. Wells, 278 S. W. 80; McConnell & Pilcher Ice & Fuel Co. v. United Railways, 238 S. W. 554; Voelker Products Co. v. United Railways Co., 170 S. W. 333; Vandeventer v. Railroad, 177 S. W. 838; Paul v. Railroad, 152 Mo. App. 586; Green v. Railroad, 192 Mo. 131; Ross v. Wells, 255 S. W. 952; Schmidt v. Railroad, 191 Mo. 215; Burge v. Railroad, 244 Mo. 94; Mockowik v. Railroad, 196 Mo. 571; Gubernick v. United Railways, 217 S. W. 35; Kelsay v. Mo. Pac. Ry. Co., 129 Mo. 372; Huggart v. Mo. Pac. Ry. Co., 134 Mo. 673; Hayden v. Railroad Co., 124 Mo. 566; Sanguinett v. Railroad Co., 196 Mo. 466. (2) Plaintiff's Instruction 1 was error. (a) It should not have been given, because the plaintiff was guilty of contributory negligence, as a matter of law, and, therefore, the case should not have been submitted to the jury under the assignment of negligence based upon the alleged violation of the speed ordinance. Authorities supra; Gubernick v. United Railways Co., 217 S. W. 35; Costello v. United Railways Co., 213 S. W. 180; Voelker Products Co., v. United Railways Co., 170 S. W. 333. (b) Furthermore, the instruction is erroneous in that it did not require the jury to find that "at the time and place of the collision" the street car was being run at a rate of speed in excess of fifteen miles per hour; by this instruction the jury were erroneously told by the court that if the street car had been running at a rate of speed in excess of fifteen miles per hour a block or two, or even more, farther west, the defendant would still be liable. The instruction is, therefore, clearly erroneous. Battles v. United Railways Co., 161 S. W. 614; Stepp v. Ry. Co., 85 Mo. 233; Shunk v. Harvey, 223 S. W. 1069; Lackey v. United Railways Co., 288 Mo. 146. (3) Instruction 3, given to the jury at the request of the plaintiff, was erroneous. There was no evidence whatever in the record that the plaintiff knew of the existence of the speed ordinance, or that he relied upon the defendant's observance of same; therefore, the court erred in instructing the jury that the plaintiff had a right to rely upon the car not being run in excess of fifteen miles per hour. Voelker Products Co. v. United Railways Co., 170 S. W. 333; Mockowik v. Railroad Co., 196 Mo. 550, 94 S. W. 256; Paul v. United Railways Co., 152 Mo. App. 577, 134 S. W. 3; Paul v. United Railways Co., 160 Mo. App.

599, 140 S. W. 1196; Battles v. United Railways Co., 161 S. W. 614; Hall v. Railroad, 240 S. W. 175; Monroe v. Railroad, 297 Mo. 648. (4)   The damages assessed by the jury are grossly excessive and the verdict is so excessive as to indicate that it was the result of passion and prejudice on the part of the jury, and for that reason should have been set aside and a new trial granted.   Jones v. Ry. Co., 287 Mo. 78; Rigley v. Pryor, 233 S. W. 832; Neal v. Rys. Co., 229 S. W. 219; Corn v. Ry. Co., 228 S. W. 82; Lilly v. Rys. Co., 209 S. W. 973; Banks v. Morris, 257 S. W. 482; Corbett v. Rys. Co., 243 S. W. 902.

*Douglass & Inman* for respondent.

(1)   The demurrer offered by defendant at the close of the case was properly overruled because: (a)   The facts in evidence are the same at the former trial except they are strengthened by the evidence of the witness Walsh and plaintiff, and, therefore, the opinion in this case on the former appeal is binding on this court and settles the law of the case.   Unterlachner v. Wells, 278 S. W. 79.   (b)   The plaintiff was not guilty of contributory negligence as a matter of law.   Unterlachner v. Wells, 278 S. W. 79; Lackey v. United Rys. Co., 288 Mo. 128; McDonald v. United Rys. Co., 245 S. W. 559; Bosley v. Wells, 260 S. W. 125; Mason v. United Rys. Co., 246 S. W. 318; Alexander v. Traction Co., 249 S. W. 971.   (c)   If there are any discrepancies in the evidence, and especially that of plaintiff, the weight and credibility of this evidence was for the jury and not this court.   Finnegan v. Railroad, 244 Mo. 653.   (2)   Instruction 1 is not erroneous as claimed by the defendant for (a)   It is not necessary that the evidence show that plaintiff was familiar with the speed ordinance and relied on it being observed as claimed by defendant.   Kinney v. Wells, 214 Mo. App. 79; Henderson v. Railroad, 248 S. W. 987, 284 S. W. 989; Swigart v. Lusk, 196 Mo. App. 471.   (b)   This instruction does require the jury to find that the violation of the speed ordinance was the proximate cause of the accident.   Lackey v. United Rys. Co., 288 Mo. 120; Battles v. United Rys. Co., 178 Mo. App. 614; Schmidt v. Transit Co., 140 Mo. App. 187.   (3)   The verdict of the jury is not excessive for the injuries sustained by plaintiff as disclosed by the evidence.   Heigold v. Railways Co., 308 Mo. 158; Woodley Petroleum Co. v. Willis, 290 S. W. 953.

GRAVES, P. J.—This is a second appeal in this case.   When first here (278 S. W. 79) the plaintiff appealed from a judgment against him.   In that appeal, the only question was whether or not plain-

tiff was guilty of contributory negligence as a matter of law. While there were four grounds of negligence charged against the defendant, the plaintiff submitted the case then, as he did in the second trial, upon a violation of the speed ordinance. On the first appeal we ruled, (1) that the speed limit was fifteen miles per hour, and that there was evidence upon which the jury could find that the street car was running much in excess of such speed limit, i. e. thirty miles per hour, and (2) that the jury could well find that such excessive speed occasioned the injury to plaintiff. The issues were the same upon this trial as upon the previous one. Plaintiff submitted his case upon the single ground of negligence stated, supra, and defendant, after having, by instructions, withdrawn the other alleged grounds of negligence from the jury, pressed the alleged contributory negligence of the plaintiff, and in so doing say that the record evidence is different from that on the former trial. There is serious question as to whether or not defendant's Instruction 9 withdrawing the humanitarian rule would not have been error, had not plaintiff voluntarily abandoned that issue, by failing to submit it by instruction. At the second trial, involved in the record now before us, the plaintiff had a verdict for $17,500 and judgment was entered for said sum, from which defendant has appealed. When the case was first in this court (Unterlachner v. Wells, 278 S. W. 79) there was little dispute about the facts. At that time we then stated the case (278 S. W. 1. c. 80, 81):

"Action for personal injuries. The plaintiff was struck and injured by an eastbound street car, operated and run by defendant upon Arsenal Street in the city of St. Louis. The accident occurred at the intersection of Arsenal Street and Macklind Avenue. With some slight modifications, the respondent agrees to appellant's statement of facts.. In respondent's brief it is said:

" 'The statement of facts contained in appellant's brief is a fairly correct abstract of the proceedings that were had before the trial court. We desire, however, to point out a few additional facts.'

"We shall not overlook these additional suggestions in the course of the opinion. The appellant's statement is as follows:

" 'This is an action for damages which plaintiff claims he sustained on or about the 1st day of February, 1922, when he was struck by one of the defendant's cars and injured. The accident occurred at the intersection of Macklind Avenue and Arsenal Street. Arsenal Street is an east-and-west street in the city of St. Louis, about thirty-six feet wide, and Macklind Avenue is a north-and-south street about the same width. Macklind does not cross Arsenal Street, but extends from Arsenal Street north at 5400 west on Arsenal Street. The sanitarium grounds are on the south side of Arsenal Street, at the point opposite the intersection of Macklind. There are no car tracks on

Macklind Avenue.  At the time of the accident there was a store building on the northeast corner of this intersection, referred to in the evidence as the confectionary store, and a saloon building on the northwest corner.  Westbound cars run on the north track, and eastbound cars on the south track.  From the north curb line of Arsenal to the first rail of the westbound track is ten feet and six inches and to the first rail of the eastbound track from the north curb line is twenty feet and eight inches.  At the time of the accident, westbound cars stopped at the northeast corner (that is, the near side), and eastbound cars stopped with the front of the car about even with the west curb line of Macklind, or what would be the near side if Macklind crossed Arsenal.  After the accident, the eastbound cars changed the stopping place to the east side of Macklind and stopped with the front end about even with the east building line of Macklind Avenue if extended across Arsenal at a yellow pole on the south side of Arsenal, about even with the east building line of Macklind.  There is a slight up-grade on Macklind west, of about three feet to the hundred feet.

" 'On the evening of February 1, 1922, the plaintiff had been visiting at the confectionary store on the northeast corner of the streets mentioned, and about ten P. M. he saw a car coming from the west about a block away, and he started from the northeast corner to go across to the southwest corner where the car stopped at that time, in order to catch this car, and was struck by the car about when he was on the north rail of the track.  Plaintiff does not remember anything that happened from the time he started across the track.

" 'Just before the approach of this eastbound car to this intersection, a westbound car had stopped on the east side of Macklind and two of plaintiff's witnesses, Charles Kranz and George Larkin, got off of the car, and, when the car moved on, they started across Arsenal to the south side in order to go to the sanitarium building where they were employed at that time.  They began their work about eleven P. M. and worked to seven A. M.  They were stationary engineers.

" 'One of the men, Charles Kranz, testified that when the car from which he alighted had gone on he then looked west and saw this eastbound car on the hill by the Isolation Hospital about 800 feet west; that he then started to cross Arsenal Street, bearing a little to the southeast; that when he got nearly across the street he again looked at this eastbound car, and it was then about opposite the Nickelodeon; that the Nickelodeon was 150 feet west of the west building line of Macklind; that the witness since the accident had measured that distance; that at the same time he saw this car up at the Nickelodeon he also noticed the plaintiff just leaving the northeast corner of the sidewalk and run diagonally across toward what

would be the southwest corner if Macklind crossed Arsenal, the place where the eastbound cars stopped at that time to receive and discharge passengers. At the same time he noticed a man standing at this southwest corner at the usual place where eastbound cars stopped to receive and discharge passengers. He watched this car and the plaintiff, and when plaintiff reached the north rail of the eastbound track plaintiff "kind of" stopped and threw his head back. He said: "It looked to me like he ran and when he got there he seen the car was not going to stop, and he tried to jerk back; and then, after he jerked back, why the car hit him, the left-hand side of the front end of the car, about the corner—the front of the car, the left-hand front of the corner."

"'He testified that he observed the rate of speed this car was traveling, and he estimated it at least twenty miles per hour; that the car did not check its speed before it struck plaintiff, and it ran 120 feet before it stopped; that there was no gong sounded before the car struck plaintiff. The witness testified he had been employed at the sanitarium for seven and a half years, and that he frequently got off at that corner, and was familiar with that corner and where the eastbound and westbound cars stopped at that time; that when the car hit plaintiff it knocked him about thirty feet.

"'The other man, George Larkin, who got off the westbound car, testified that he got off the car at the same time the witness Kranz did; that he was also employed at the City Sanitarium, and had been employed there for two years and eight months; that he frequently got on and off cars at the intersection of the streets mentioned, and was familiar with that location, and where the east and west cars stopped; that at the time of the accident mentioned and prior thereto westbound cars stopped with the front end about even with the west building line of Macklind, or what would be the near side if Macklind crossed Arsenal; that after the accident they changed the stopping place of eastbound cars so that they stopped with the front end about even with the yellow pole on the south side of Arsenal, which was about even with the east building line of Macklind. He saw the car that struck plaintiff at the Isolation Hospital on the hill, and saw it again about even with the Nickelodeon. He did not see plaintiff run across the street, but he did see the street car strike an object, and saw it knock plaintiff about thirty feet, and he went to the plaintiff and identified the plaintiff as the party struck. He says plaintiff was struck by the northeast corner of the car at about the middle of Macklind and when he was about on the north rail of the eastbound track. He testified he was able to judge the rate of speed, and that in his opinion the car that struck plaintiff was traveling about thirty miles an hour. He also saw a man standing at the usual stopping place where eastbound cars stopped at that time. Af-

ter the car that struck plaintiff stopped, he measured the distance it ran, and it was 120 feet from the yellow pole on the south side of Arsenal and the east side of Macklind to the car after it stopped. (This made it run about 145 feet.)

" 'One of the witnesses testified it was twenty-five feet from the point where plaintiff was struck back to the edge of the sidewalk at the northeast corner, and both testified plaintiff was knocked thirty feet.

" 'We have not set out the plaintiff's evidence, because at the time of the trial he was in such a condition that he practically "had no mind," as will be seen by reading the evidence of the plaintiff himself as contained in the record, and also the evidence of the witness Woodring, beginning on page 26 of the abstract.'

"The petition contained four grounds of alleged negligence, but in submitting the case the plaintiff abandoned all except the alleged excessive speed of the car in violation of the speed ordinance of the city of St. Louis, which limited the speed of a street car at the point of accident to fifteen miles per hour. Appellant says that he only urges error in the giving of certain instructions given by the court for the defendant. Defendant pleaded contributory negligence, and now urges that the judgment is right and for the right party and should be sustained upon this ground of contributory negligence, although there may be error in the instructions given for defendant. He urges that there was no error in the instructions, however. Upon a trial before the court and a jury there was a verdict for defendant, and judgment was entered in accordance with the verdict. From such judgment this appeal is taken. Other matters are left to the opinion."

We then ruled that plaintiff was not guilty of contributory negligence, as a matter of law: that there was evidence from which defendant's causal negligence could be found, and that for errors in defendant's instructions the judgment was reversed and cause remanded for a new trial.

With the former facts before us, supra, we can compare them with the present record. Alleged error will be noted in the course of the opinion, along with the additional facts, if such there be.

I. Defendant strenuously insists that, under the present record, the plaintiff was guilty of contributory negligence as a matter of law. We considered with care the question of contributory negligence when the case was here before. In fact we held up **Former** the motion for rehearing for a time to further consider **Difference** the question. At that time we fully considered Burge v. **Appeal:** **in Facts.** Railroad, 244 Mo. 76, and cases of that character. We wrote the Burge case, and so far as we know its rulings have never been questioned, but on the other hand have been many

times followed. On the question of contributory negligence, cases like the Burge case have no application to the facts of this case.. In Burge's case the railroad crossing was not a stopping place to receive passengers, nor were there passengers there to get aboard. This. is one difference. A simple reading of the facts in. the present case when here before shows clearly wherein the question was for the jury, rather than contributory negligence as a matter of law. So, unless the record on the second trial is materially different (upon this particular question) the matter is foreclosed by our previous opinion. The differences in the two records we will now consider.

As stated in the first opinion, the plaintiff testified to but little. He appeared not to be in condition to testify. His mental state seems to have improved some, between the two trials. His testimony is more voluminous this time. It will be noted in detail later, for it is largely upon his present testimony that it is urged contributory negligence as a matter of law is made to appear.

At the previous trial in addition to the plaintiff, Charles Kranz, Jr., and George W. Lakin testified. The learned counsel for defendant admits (in the brief) that the testimony of these witnesses was practically the same at both trials, and that it was correctly stated in the first opinion, from which we have quoted it, supra.

At the last trial the plaintiff introduced as a witness, Dennis Walsh. Walsh was the man who was standing at the southwest corner (the regular stopping place for eastbound cars at that time) waiting to board the car, as appeared at the first trial. Walsh says he was at the regular stopping place, and was there to board the car which injured plaintiff. Not only so, but he testifies that he signaled the car to stop, but that it passed up both him, and the stopping place, and was going then at the rate of thirty miles per hour. Plaintiff was struck a few feet eastward, but the car prevented Walsh from seeing the impact or blow. Certain it is that Walsh's testimony helped rather than weakened plaintiff's case, in comparing the two records. The whole contention therefore must be determined by the testimony of the plaintiff himself, and this we examine next.

II. There are some differences in the several portions of plaintiff's testimony relative to his observations of the on-coming street car. In the former trial he said that he was in the con-
**Plaintiff** fectionary store at the northeast intersection corner, and
**as Witness.** looking out of the window saw the eastbound car coming. He then said that he left the store, and walked out on the sidewalk, and as he turned from this walk to go to the southwest corner, he looked and saw the car coming about 150 feet away. He testified then, as he testifies now, that he did not know the speed of the car.

After leaving the sidewalk (at the former trial) plaintiff did not remember what happened, except that something struck him.

Upon this trial he says the same thing about seeing the car and leaving the store, and looking as he left the sidewalk, and that the car was then 150 feet away, and on cross-examination he did say that it was coming at a pretty good speed for an up-hill pull. There was over three per cent up-grade at this point. It might be said that fifteen miles per hour (the ordinance speed limit) is no slow gait for a car coming up hill.

In this last trial plaintiff says he does not remember how he traveled in going the thirty-five or forty feet from the sidewalk to the track upon which he was struck. At the first trial he thought he was walking, but an eye witness, both at that trial, and at the present one, said he was running at some eight or ten miles per hour. Plaintiff says he was trying to make this car. At this trial he says he saw the waiting passenger and saw him wave the car to stop; that he left the store about ten o'clock P. M., and saw that the coming car was lighted; that he knew the regular stopping place for eastbound cars was at this southwest corner; that he often went to this store on the northeast corner; it would appear that he was paying some attention to the daughter of the proprietor.

His evidence at least shows that he was familiar with the running of the cars, as well as the surroundings of the place.

Even in the last trial the plaintiff seems to have had in mind, more thoroughly, what he saw as he left the sidewalk, than elsewhere in his journey. He says now, as he said before, that he does not remember what struck him, but it must have been the car. His action just the moment before he was struck shows that he did not see the car at the time. Appellant urges that he now testifies that he saw the car all the time up to the time he was struck, and this they urge convicts him of contributory negligence. That portion of the evidence collated by appellant's counsel is as follows:

"Q. Then you stepped out of the soft-drink parlor and you walked over to the corner of the curb, as I understand you; is that right? A. Yes, sir.

"Q. And stopped again? A. Yes, sir.

"Q. Then you saw the street car for the second time? A. Yes, sir.

"Q. And did you have occasion to observe its speed at that time? A. No, not that I remember.

"Q. Did you see the street car any more from that time until after the accident? A. Yes, I saw it.

"Q. When? A. Just before I stepped off of the sidewalk.

"Q. That is when it was 150 feet away? A. Yes, it was about 150 feet.

"Q. And it was in motion at that time; is that right; it was moving? A. It was moving, yes.

"Q. Now, then, how far away were you from the street car tracks at that time? A. Well, I suppose about thirty or forty feet.

"Q. And the street car was about 150 feet away from where it stops; is that right? A. Yes, sir.

"Q. And you were about thirty or forty feet from the street car track; is that correct? A. Yes, sir.

"Q. Now, then did you have occasion to observe the speed at which it was traveling then before you stepped off of the curb? A. I don't remember the speed; I couldn't just tell you.

"Q. You could still see the headlights? A. Yes, I could see the headlights.

"Q. Did you walk or run from that time on? A. That I don't remember, whether I walked.

"Q. You don't remember whether you walked or ran? A. No, sir.

"Q. But you wanted to get on this street car? A. Yes, sir.

"Q. Wanted to take passage on it and wanted to get over there in time to get on the street car; is that right? A. Yes, sir.

"Q. Now, then, do you know whether or not you looked towards the street car again from that time until the accident? A. Yes, I looked again and I saw a man standing.

"Q. Was that before you stepped off of the sidewalk or afterwards? A. Just as I stepped off of the sidewalk.

"Q. Did you see the street car any more from the time just as you stepped off of the sidewalk until the accident? A. Yes.

"Q. Where did you see it the next time? A. Just about 150 feet away from there.

"Q. I understand that, but I am talking about that time; as I understand you, that was just before you stepped off of the sidewalk; am I right—just before you stepped off of the sidewalk you saw the street car about 150 feet away? A. Yes, sir.

"Q. After you stepped off of the sidewalk and as you traveled that thirty-five or forty feet to the street car, did you see the street car any more? A. Yes, sir; I saw the car.

"Q. Where did you see it; where were you when you saw it next? A. I just saw it in motion.

"Q. Did you keep watching it all the time from the time you stepped off of the sidewalk until the accident? A. Well, I saw it in motion; that is all. I just determined to get the car.

"Q. I am talking about after that; did you see that street car any more from that time until the accident? A. Yes, sir.

"Q. When did you see it next? A. I just looked right up and I saw it approaching.

"Q. How far away was it when you stepped on the car tracks? A. That I don't remember.

"Q. Can you give the jury any idea as to how far away it was when you stepped on the car tracks? A. Nothing that I can remember on that.

"Q. But you would say that you saw the street car approaching during the entire time that you were crossing the street in a diagonal direction; is that right? A. Yes, sir."

On re-direct examination:

"Q. You say you saw it 150 feet; did you see it after that any more?

"MR. GREEN: I object to that, if the Court please, being cross-examination of his own witness.

"MR. DOUGLASS: No.

"THE COURT: He may answer.

"To which action and ruling of the court defendant, by his counsel, then and there duly excepted and still excepts.

"A. Yes, I saw the car coming.

"MR. DOUGLASS: Q. You say you saw it coming then? A. Yes, sir.

"Q. Did you see it any more after that before the accident—while you were stepping off, or when you stepped off you say you saw it 150 feet away up there? A. Yes, sir.

"Q. Is that the last time, or did you see it another time after that? A. I saw it again.

"Q. When was that? A. That I don't remember. I saw it continuously."

Counsel for respondent has collated other fragments of the plaintiff's testimony thus:

"Q. Did you see the car any more after you looked up and saw it about 150 feet west of Macklind; did you see that car any more? A. No, not as I remember.

"Q. After you stepped off of this sidewalk and started across the street as you have described, what is the next thing that you remember after that? A. I remember this man stepped off the sidewalk and raising up his hand.

"Q. What is the next thing you remember after that? A. I don't know anything. . . .

"Q. And did you have occasion to observe its speed at that time? A. No, not that I remember.

"Q. Did you see the street car any more from that time until after the accident? A. Yes, I saw it.

"Q. When? A. Just before I stepped off of the sidewalk.

"Q. That is when it was 150 feet away? A. Yes, it was about 150 feet.

"Q. And it was in motion at that time; is that right; it was moving? A. It was moving, yes. . . .

"Q. Now, then, do you know whether or not you looked towards the street car again from that time until the accident? A. Yes, 1 looked again and saw a man standing.

"Q. Was that before you stepped off of the sidewalk or afterwards? A. Just as I stepped off of the sidewalk.

"Q. Did you see the street car any more from the time just as you stepped off of the sidewalk until the accident? A. Yes.

"Q. Where did you see it the next time? A. Just about 150 feet away from there.

"Q. I understand that, but I am talking about at that time; as I understand you, that was just before you stepped off of the sidewalk; am I right—just before you stepped off the sidewalk you saw the street car about 150 feet away? A. Yes, sir.

"Q. After you stepped off of the sidewalk and as you traveled that thirty-five or forty feet to the street car, did you see the street car any more? A. Yes, sir; I saw the car.

"Q. Where did you see it; where were you when you saw it next? A. I just saw it in motion.

"Q. Did you keep watching it all the time from the time you stepped off of the sidewalk until the accident? A. Well, I saw it in motion; that is all; I just determined to get the car.

"Q. You were determined to get over there before the street car got there, so you could get on; is that right? A. Yes.

"Q. You started across the street with the determination you were going to get on that street car and take passage on it; is that right? A. Well, I saw the man standing there.

"Q. I understand that, but I am talking about the street car; did you watch that street car as you ran across the street or as you ran or walked—because I understand you to say you don't know which you did—but as you went across the street, whether it be in a run or walk, did you watch and observe the approaching street car? A. Yes, sir; I did.

"Q. Did you see it all the time until you got over there? A. No, not all the time.

"Q. When was the last time you saw it before the accident; how far away were you from the street car tracks at that time? A. Just about 150 feet away.

"Q. The street car was 150 feet away? A. Yes, sir.

"Q. At that time you were over on the sidewalk, as I understand you; is that right; when you saw it 150 feet away you were over on the sidewalk? A. Yes, just getting off.

"Q. Did you see the street car any more from that time until the accident? A. Not that I remember.

317 Mo.—13.

"Q. Then, you want this jury to understand you don't remember seeing the street car any more from the time you stepped off of the sidewalk until the accident; is that right? A. Well, I looked up and I saw this man step off; I saw this car in motion.

"Q. I am talking about after that; did you see that street car any more from that time until the accident? A. Yes, sir. . . .

"Q. When did you see it next? A. I just looked right up and I saw it approaching.

"Q. How far away was it when you stepped on the car tracks? A. That I don't remember.

"Q. Can you give the jury any idea as to how far away it was when you stepped on the car tracks? A. Nothing that I can remember on that.

"Q. But you would say that you saw the street car approaching during the entire time that you were crossing the street in a diagonal direction; is that right? A. Yes, sir.

"Q. But you don't know how far away it was at the time you stepped on the car tracks? A. No, sir.

"Q. Do you know how fast it was going at the time you stepped on the street car tracks? A. No, sir.

"Q. You know neither how fast it was going or how far away it was at the time you stepped on the track; is that correct? A. No, sir; I don't know."

All considered, this evidence shows: (1) that plaintiff is not yet clear as to just what he saw, and where and when he saw it; (2) that the things best recollected by him was the approach of the car, when it was 150 feet west of Macklind, and the action of Walsh at the stopping place; (3) that he possibly saw the car in motion as he crossed to the southwest, but did not see it at the time he got on the track; (4) that while there is the expression of continuously seeing the car up to the time of the accident, it is evident from other portions of his testimony that he did not mean it in that sense—he evidently misunderstood the word continuously; and (5) there is much to show that he was so interested on boarding the car, and getting across to the stopping place for that purpose, that he did not observe to any particular extent the movement of the car after he saw Walsh motion the car to stop, and he left the sidewalk to catch it. We do not believe his jumbled statements, in the condition he was in, is enough to justify us to declare as a matter of law that he was guilty of contributory negligence. That he did not know the car had passed the stopping place (west of the place of accident a few feet) is thoroughly demonstrated by plaintiff's action at the time. The witness Kranz said at the first trial, and substantially the same at this second trial, that he saw plaintiff run from the northeast corner (eight to ten miles per hour) and saw him as he reached

the north rail of the eastbound tracks. At that point we use the witness's words, instead of our own. Kranz says:

"It looked to me like he ran and when he got there he seen the car was not going to stop, and he tried to jerk back; and then, after he jerked back, why the car hit him, the left-hand side of the front end of the car, about the corner—the front of the car, the left-hand front of the corner."

This accords with portions of plaintiff's evidence at this trial. It does not comport with the idea that the plaintiff was looking at the car, and while looking, ran in front of it. In other words it refutes the idea of suicide. So we think a fair construction of the plaintiff's evidence is that he saw the lighted car coming, and started across to catch it; that he (as he says in several places in his testimony) saw the moving car; that he thought it would stop, and intent upon getting over to the stopping place he did not look further until about the time he got on the track.

III. As to the facts in this case making a case for the jury upon the questions of defendants' negligence and plaintiffs' contributory negligence, the matter is not only foreclosed by our previous opinion, but it was foreclosed prior to that time by Division Two of this court in Lackey v. United Rys. Co., 288 Mo. l. c. 140, which case we did not have in mind when we wrote the previous opinion. Lackey was killed and his wife sued. WHITE, C., makes a clear detail of the facts, and illustrates by a drawing. This could be read with interest. There the car passed up a regular stopping place with a passenger waving for the car to stop. There those who noticed saw the car coming when 150 feet away from the regular stop, and in that case, the speed limit was fifteen miles per hour and car was running thirty to thirty-five miles per hour. Contributory negligence was urged, and upon this point we quote from page 140 et seq. the discussion of that question:

"Other circumstances also must be taken into consideration; circumstances which do not appear in cases relied upon by appellant as showing contributory negligence on the part of one who voluntarily steps in front of an approaching car or train. The car was running at the rate of thirty miles or more an hour—twice as fast as the speed limit permitted. If Lackey saw the car one hundred and fifty feet away when he started across the right of way, he had a right—in the absence of any notice or knowledge to the contary—to assume that it was traveling within the speed limit. [Powers v. Transit Co., 202 Mo. l. c. 280; Harrington v. Dunham, 273 Mo. 414, l. c. 423; Moon v. St. Louis Transit Co., 237 Mo. l. c. 430 et seq; Eckhard v. St. Louis Transit Co., 190 Mo. 593, l. c. 617; Riska v. Union Depot Railroad Co., 180 Mo. l. c. 191; Strauchon v. Met. Street Ry. Co., 232 Mo. 587, l. c. 600, 601.] He might very well misjudge

the speed of the car seeing it as it came head on.  It has been said by this court to be a matter of common knowledge that one seeing a running car at an acute angle—for instance, from the front—is not nearly so well able to judge of its speed as one viewing it from the side.  [Strauchon v. Met. St. Ry. Co., 232 Mo. l. c. 599.]  Furthermore, it was the duty of the motorman of the approaching car to stop on the south side of Plymouth Avenue, because it was a regular stop, and he was signalled to stop by Hadley who sought passage.  If Lackey saw the car approaching, as appellant asks us to assume, we might as well assume that he saw Hadley's signal to the car to stop.  The cases in the last group cited discuss the assumptions upon which one approaching a track may rely under varying conditions.  Lackey had a right to assume that the approaching car was running within the speed limit and that it would stop on the other side of the street, and to act upon the assumption, unless he knew to the contrary.  In either case he could have crossed in safety, and was not negligent in attempting to do so.  Appellant cites the case of State ex rel. Peters v. Reynolds, 214 S. W. 121, recently determined by this court, in which one crossing a railroad track was killed, and was not seen from the time he started to cross the track a little distance away until after he was hit.  It was held by this court, approving the ruling of the St. Louis Court of Appeals, that the plaintiff was negligent as a matter of law, because if he had looked he must plainly have seen the approaching train, and he was negligent if he failed to look.  Other cases might be cited where recovery has been denied on account of contributory negligence, although the party injured or killed was not seen for a brief interval between the fatal collision and where he was previously at some point of safety.  In all of these cases the right to assume the approaching train or car was running at a given speed, or would stop, is entirely absent.  This court in the case of State ex rel. Peters v. Reynolds, supra, said, l. c. 123, in distinguishing the cases where such assumption was allowed:

" 'In all those cases some specific violation of duty or of a custom by defendant company is considered, and it is held that a pedestrian may presume and act upon the presumption that there will be no such violation, but that the usual and regular, or prescribed, method will be followed.  Also in each of such cases there was an absence of actual knowledge of the failure of duty; that is, the pedestrian who acted upon such presumption either could not see or hear the approaching train, or was in such position that he would likely misjudge its rate of speed.'

"The court then points out that the facts in that case did not show the deceased had reason to believe that the train would run at a rate of speed less than that at which it was running.

"The facts in this case come clearly within the exception noted here. Here Lackey did have reason to believe the car would run at a particular rate of speed. He did have reason, if he saw the car at all, to believe that it would stop. He had a right to rely upon the observation by defendant of a duty which its regulation and the city ordinance required it to perform."

We cannot add to this discussion. In this case the plaintiff did not know the speed of the car, although he saw it. He did know that the southwest corner of the intersection was the regular stopping place, and that a passenger there had waved the car to stop. He had the right to assume that it would stop, and this disrobes him of contributory negligence as he ran the thirty-five or forty feet. He did have the right to assume (without knowledge to the contrary) that the car was running not to exceed fifteen miles per hour. Had it been so running (even without stopping, as it should have done) plaintiff would have crossed in perfect safety. Two more steps would have cleared him. We rule now, as we ruled before, that the question of contributory negligence was one for the jury, as was also the negligence of the defendant in running above the speed limit.

IV.  What we have said, supra, disposes of the demurrer to the evidence, which is the main contention of appellant.

It is next urged that there was error in giving Instruction 1 for the plaintiff.  First, it is said that the demurrer to plaintiff's evidence should have been sustained, and therefore it was error to submit the case by Instruction 1. Our disposition of the ruling upon the demurrer is against this contention as to Instruction 1, and such contention cannot be allowed.

The second and last contention against Instruction 1, is thus worded:

"(b)  Furthermore, the instruction is erroneous in that it did not require the jury to find that 'at the time and place of the collision' the street car was being run at a rate of speed in excess of fifteen miles per hour; by this instruction the jury were **Place of** erroneously told by the court that if the street car had been **Accident.** running at a rate of speed in excess of fifteen miles per hour a block or two, or even more, farther west, the defendant would still be liable. The instruction is, therefore, clearly erroneous."

This contention is not well founded in fact. The first paragraph of the instruction tells the jury that the speed ordinance, in evidence, "provides that no car shall be run at a greater rate of speed than fifteen miles per hour on Arsenal Street *at the intersection* of Macklind Avenue" and that running at a greater speed was negligence. The intersection was but a few feet west of the point of accident, so that the instruction does speak of the speed as of the place of the

accident, and not as to such speed blocks to the west of the point of accident.

So also the last paragraph of the instruction refers to the rate of speed at the point of the accident and not otherwise. This paragraph also locates the speed as of the intersection of Arsenal Street and Macklind Avenue. It requires the jury to find that plaintiff was crossing Arsenal Street *at such intersection,* and then says if he was struck by the eastbound car when so crossing and was injured, and that said car was being run at a greater rate of speed than fifteen miles per hour, and further that if the jury finds that plaintiff would have crossed in safety but for the speed being greater than fifteen miles per hour, then the verdict should be for plaintiff. It is clear that the instruction as a whole speaks only of the speed at the point of the accident. The objection to such instruction is not well taken.

Objection is made to Instruction 3 for the plaintiff. This instruction is short and reads:

"The court instructs the jury that if you find from the evidence that as plaintiff started to cross Arsenal Street over the defendant's eastbound tracks he saw the eastbound car mentioned in the evidence approaching from the west, and if the said car was at such a distance as not to imperil plaintiff in crossing said

**Contributory Negligence.**

track, if said car was not running faster than fifteen miles an hour, if so; and if the plaintiff did not know that said car was running at a speed in excess of fifteen miles an hour, if so run, and in the exercise of ordinary care in looking and listening would not have so known; and if said car was in fact running at a speed in excess of fifteen miles per hour, then the court instructs the jury that plaintiff had a right to cross said track relying on said car not being run in excess of fifteen miles per hour; and in using ordinary care and expedition in doing so, if he was doing so, then he was not guilty of contributory negligence."

The answer charged plaintiff with contributory negligence. The defendant asked and received an instruction upon that theory. Instruction 3, supra, simply tells the jury that if they find certain facts (detailing them) from the evidence, then they could not find the plaintiff guilty of contributory negligence. We think the instruction at least harmless. The objection urged is that there was no evidence that plaintiff knew of the existence of the speed ordinance, or that he relied upon the observance thereof by the defendant. So far as the negligence of the defendant is concerned, it makes no difference whether the plaintiff knew of the speed ordinance or not. [Henderson v. Ry. Co., 284 S. W. l. c. 789.] Running the car at a rate of speed in excess of the ordinance rate was negligence *per se* and if injury to a person arose from such negligence, then there is liability.

Plaintiff's knowledge or want of knowledge of the ordinance, and his knowledge or want of knowledge of the rate the car was run, is only of importance in determining the question of contributory negligence (Henderson v. Ry. Co. supra, wherein we approved such ruling by the Springfield Court of Appeals), and important only to show whether or not plaintiff was in the exercise of ordinary care in attempting to cross the track at the time and place. This instruction required the plaintiff to use ordinary care in looking and listening to find out whether the car was running over fifteen miles per hour. But the instruction does say that he (plaintiff) had a right to rely upon the fact that the car was not running in excess of the ordinance rate, and would not be so run. The later cases so rule, and in these cases the record does not show that the plaintiffs had actual knowledge of the ordinance provision. [Lackey v. United Rys. Co., 288 Mo. l. c. 141; Powers v. Transit Co., 202 Mo. l. c. 280; Harrington v. Dunham, 273 Mo. l. c. 424; Eckard v. Transit Co., 190 Mo. l. c. 617; Riska v. Union Depot Railroad Co., 180 Mo. l. c. 191.] In fact this court has approved an instruction in substance like Instruction 3 in this case. [Powers v. Transit Co., 202 Mo. l. c. 281, supra.]

But we have in mind a further point. The residents of a city are presumed to know the ordinances under which they live. The presumption, of course, is not conclusive. In certain instances such presumption may be rebutted. If a resident violates one, it certainly is no defense that he had no knowledge of such an ordinance. For all legal purposes he knows the ordinances, whether he knows them in fact or not. At the very least he would be presumed to know the ordinance, until the contrary is made to appear. [10 R. C. L. sec. 17, p. 873; State ex rel. v. Salt Lake City, 18 Ann. Cas. p. 1130; 21 Cyc. 1725 et seq.] This presumption fills the place of evidence in the absence thereof. And as the matter is only material upon the defense of contributory negligence, whose duty is it to produce the facts? Can there be any doubt that this duty of destroying this presumption, by producing the facts, rests upon the party pleading contributory negligence? We think not.

The only direct case against this rule is that of Mockowik v. Railroad, 196 Mo. l. c. 571 et seq. In that case Judge LAMM ruled that, as the plaintiff was living and at the trial was a witness, if he knew of the ordinance rate of speed, and relied upon it, he should have given in evidence these facts, and not having done so, he could not rely upon a "friendly presumption," i. e. that he knew the ordinance and relied upon defendant obeying it. This opinion was by three judges in Division One. The fourth judge was not sitting.

I fear that our distinguished and much lamented Brother was wrapped up in preserving for the future the witicism of Mr. Chandler,

a distinguished negligence-case lawyer of St. Louis, on the question of presumptions, and did not consider the full bearing of his ruling. Nor did he catch all of Mr. Chandler's witicisms in the case mentioned. Chandler started his argument for the defendant (appellant) in a damage suit, by saying: "Plaintiff's case rests wholly upon the bosoms of a whole family of friendly presumptions," and then he proceeded to tell what such presumptions were, as stated. Judge LAMM did not consider, nor discuss the fact, that the evidence of the real facts (in lieu of the presumptions) would be solely of use upon the question of contributory negligence, a matter of defense. He did not discuss the fact as to whose duty it was to bring out all facts tending to sustain the defense of contributory negligence. This court had previously ruled differently, and the more recent cases, mostly from Division Two, are certainly not in accord with the latter paragraph of Judge LAMM's opinion. We think that the plaintiff can rely upon the presumption that he knew the law, and the further presumption that the defendant would obey the law (ordinance) and not run at an excessive speed. As the LAMM opinion, supra, was in this Division, we can correct our own errors, without sending the case to the whole court.

It certainly is not the duty of the plaintiff to voluntarily help the defendant make good his defense. Defendants have the right to cross-examine the plaintiff, and if the defendant wants to break down a presumption, by proof from the plaintiff, it can be done on cross-examination, if the plaintiff knows facts which will destroy that presumption or presumptions.

VI. The next contention is that there was error in giving Instruction 2, relative to the speed ordinance, but the only reason for the contention is that the plaintiff was guilty of contributory negligence as a matter of law. Our ruling to the contrary disposes of this contention of learned counsel. There is in this connection a further contention that there was error in refusing to give defendant's Instruction 3. This instruction (as requested) is so clearly wrong, that we shall not take up further space thereon.

This leaves only the contention that the damages are excessive. Of this question next.

VII. From what we have said, supra, the plaintiff is entitled to recover in some reasonable sum. The question is whether or not the verdict is excessive under the facts. We approach this question with **Excessive Verdict.** hesitancy, realizing that a large majority of the Court en Banc are favoring more liberal judgments than the writer. In fact, we dissented time after time upon amount solely, and only quit when just so often brought face to face with the more liberal rule of the majority. That rule (established by a

majority of this Division, and later by Court en Banc) is binding upon us, at least since the action in Banc. So in considering this verdict we shall keep in view the more liberal rule of the court.

In cases of this kind counsel upon one side usually minimize the injuries, while counsel upon the other magnify them. The only safe course for the judge is to go to the record. Thus in this case it is said there is no evidence of permanent injury, where the record shows that the hearing in the left ear is practically gone. This ear was in this condition at the first trial and from the date of accident, and at the second trial (four years after the accident) Dr. Todd says there was no improvement or change in this ear condition. A jury could well conclude that it was permanent, when it is considered that there was bleeding from this ear and the nose at the time of and just after the accident, which bleedings indicated a fracture of the base of the skull, and internal injuries therein. Dr. Todd had treated plaintiff from March, 1922 (the accident was in February, 1922) to date of the second trial. He testified to his mental state, and other troubles, and then says: "I think he is a *perpetual care* almost." This is some evidence of permanent troubles. There is not much difference between "perpetual" and "permanent." Dr. Todd examined plaintiff on March 23, 1922. Of the then condition of plaintiff, and of the conditions from then on to the second trial, he thus speaks:

"Q. What did you find then? A. Well, at that time and the times immediately following—the complete study was not made the first time I saw him.

"Q. The complete examination, then? A. The complete findings were a large scar over the left parietal eminence; that is, this part over the skull (indicating), about two inches long and three-quarters of an inch wide. A mashing of the tissues had taken place there, and also back of the left ear, a scar that was the result of a bruising of the soft parts, and a small one of the same kind back of the left ear. A scar on the inner side of the shin about four inches above the left ankle. A small scar over the left patella, or known as the kneecap. The left ear drum was scarified and red, swollen and thickened. I made a study of the records at the City Hospital and my study and diagnosis—shall I mention those points?

"Q. I will offer those later. A. He was mentally dull; he was very slow-thinking and erratic in his talk, his conversation. He would repeat himself in a way of questions and answers; start a sentence and stop it and begin again. And several times he came to the office and would not remember having been there, and would explain when he came in the evening he couldn't come in the afternoon because of something, when he had been there in the afternoon. His mental condition was quite below par. His hearing in the left

ear was impaired; almost no hearing at all as far as the watch tick was concerned. I made only a general examination of that, as I am not an ear specialist. His eyes were very shifting and at times appeared crossed, a central nervous system disturbance of some character, which would give manifestations of trouble to the optic nerve or control of the eye, and that would show something quite prominently, and other times not so much so, as also would his mental condition. Those are all the findings that I remember at the time, except the records I studied in the case.

"Q. How long was he under your care or observation, doctor? A. Well, he was under my care and observation—those I sent him to and so forth—from then until now. *I think he is a perpetual care almost.*

"Q. When did you last see him? A. Just a few days ago.

"Q. What was his condition then? A. The scars are not as prominent as they were at that time. The ear condition remains as it was at the time. He can't hear in the left ear practically at all. There is that little peculiarity in the mentality, but not to the extent it was in 1922. His mind has improved quite considerably since that time. The crossing of the eyes is not in evidence now as it was, although there is some shifting. That is about all that I think of.

"Q. Doctor, suppose that he should sustain a blow here on the part of the head where you found the scar and it would cause the scar which you found, and that after that he would bleed at the ear and the nose, would that indicate anything? A. Yes, sir.

"Q. What would it indicate? A. That would indicate injuries inside of the skull. The bleeding of the ears and the nose, those are two classical symptons of fracture of the base of the skull, coupled with symptons of shock and other symptons."

In addition plaintiff testified to having pains in the head, spine, and stomach, when he was in the hospital for two or three weeks after the accident; that he suffered from these up to the second trial; that he suffered from dizziness, and would see double—see two objects when there was but one; that he could do no work for a year after the accident, and that at the second trial could only do a boy's work; that while trying to do a man's work at one place he fainted and had to be sent to the hospital by the foreman; that he has improved in his mental condition. In fact both he and Dr. Todd so testify, but he had not recovered full normality at the second trial. This appears from the testimony, as it does from the character of plaintiff's evidence at the second trial. No one says that this condition is permanent, unless it is included in the statement of Dr. Todd, where he says plaintiff will be a *perpetual care.* A jury could so conclude, in view of the fact that the physical injuries needed no care. They had healed and only scars remained. These needed no care.

The mental condition, injury to a nerve center, as indicated by the movement of his eyes, and the practically deaf ear, were about all there was left for perpetual care. We overlooked another fact. Plaintiff testified that while at the hospital his left side was numb, and that this condition was with him at the second trial. A close reading of the record shows that counsel for the plaintiff has fairly summarized the plaintiff's personal evidence. Such counsel says:

"Plaintiff testified he stayed in the City Hospital three weeks strapped to the bed; that he suffered pains in his head, his left side, back and stomach, and also in his feet. His whole left side was numb; that he was bleeding at the nose and left ear. He stayed in the hospital two or three weeks and was taken home, where he remained in bed for two months. During this time he suffered intense pains in his head, back, left side, and at times in the spine and stomach; that he tried to walk, was dizzy and would see visions; would see two people where he should see but one. It was three months before he was able to get out at all; that it was a year after the accident before he could do any work; that he continued to suffer these pains in his head, back and spine; that he would have fainting spells; that about two years afterwards, while at work for the Deisel Engine Company, he fainted and fell, and they sent him to the hospital for treatment due to plaintiff's condition resulting from the accident; that at the time of his trial, four years after the accident, he still has these spells at times, and his left side continues to be numb; that he has lost his hearing in one ear; that he tried to work at several places and different times, but could not do the work, and finally had to take work at a laundry that was 'a boy's job.'"

Plaintiff was twenty-four years old at time of accident, and was earning $18 per week at such time. This would be about $75 per month of thirty days, or twenty-six days excluding Sundays. The evidence does not show what plaintiff was earning at time of last trial. It does show suffering, and that his condition was such that he had to be strapped to his bed for three days at the hospital. From these facts we must measure this verdict of $17,500. That our court has adopted the rule of more liberal verdicts in this class of cases, is thoroughly evinced by a long list of cases, decided within the last few years. We need not now discuss the cases nor the facts therein. It suffices to say that when the facts are read, and the verdicts sustained are considered, and the facts of those cases compared with the facts we have set out from the record in this case, the verdict is not excessive under our recent rulings. So, yielding to what both a majority of this Division, and the Court en Banc, have been ruling, I am constrained to say that this judgment is not excessive.

Let the judgment be affirmed. It is so ordered. All concur.