CHARLES R. MCGOWAN v. ROLLA WELLS, Receiver of United Railways Company of St. Louis, Appellant.—24 S. W. (2d) 633.

Division One, February 3, 1930.

*T. E. Francis* and *Ernest A. Green* for appellant.

654

*Wilbur C. Schwartz* and *N. Murry Edwards* for respondent.

ELLISON, C.—The plaintiff was struck by a street car operated by the defendant receiver in the city of St. Louis and sustained certain painful and some permanent injuries, chief among which was the loss of his left foot. He brought this suit for $65,000 damages, and recovered a verdict and judgment for $15,000, from which the defendant has appealed.

The negligence charged in the petition was: (1) violation of the St. Louis speed ordinance; (2) violation of the vigilant-watch ordinance; (3) common law negligence in failing to sound the street-car gong or bell; (4) violation of the humanitarian rule in failing to stop the street car or check its speed after seeing or being under duty to see the respondent in a position of imminent peril. The appellant's answer was a general denial coupled with a plea of contributory negligence in that the respondent went upon the car track after he saw and heard or should have seen and heard the street car closely approaching.

The respondent submitted his case to the jury on the humanitarian doctrine, only, abandoning the other assignments of negligence in his petition. The appellant asked a peremptory instruction at the close of the respondent's case. The court refused it. He then offered in evidence two plats of the scene of the accident which had previously been agreed to as correct, and rested, unsuccessfully renewing his demurrer to the evidence. The principle assignment of error on this appeal is directed to the refusal of the trial court to take the case from the jury. Other assignments complain of the refusal of instructions, the erroneous admission of evidence, improper argument by respondent's counsel and the size of the verdict. We have concluded respondent made a jury case, but that the argument was prejudicial.

The plaintiff was thirty-four years old when injured. He was a boiler-maker's helper, and worked with sheet metal on boilers, smoke-stacks and the like. The accident occurred near the intersection of Ninth and Sidney Streets in St. Louis about 7:30 o'clock on Saturday evening, January 17, 1925. A plat showing the scene of the accident was introduced in evidence by respondent. We reproduce it on the following page, eliminating some of the detail.

From the plat it will be seen that Sidney Street runs northwest and southeast. Ninth Street bears west of south, but there is a jog where it crosses Sidney Street; that is to say, Ninth Street enters the north side of Sidney Street at a point some distance east of where it leaves on the south side and continues on southerly.

A double-track street-car line, referred to in the evidence as the Natural Bridge line, runs south along the middle of Ninth Street until it approaches a point about one-half block north of Sidney Street. There the tracks veer to the west and run diagonally across a vacant lot and thence continue southerly along Ninth Street as it extends on

south from Sidney Street. In this manner the car tracks are accommodated to the jog in the street. The east track is used by northbound cars and the west track by southbound cars. The regular stopping place for these latter is just north of the sidewalk on the north side of Sidney Street, on the vacant lot. Throughout their course across the lot the car tracks, and any street car thereon, are clearly in view of persons travelling along the sidewalk.

The distance along the street-car tracks from the point where they cross the south line of the alley on the north side of the vacant lot to the curb on the north side of Sidney Street, is 165 feet. The width of both Ninth and Sidney Streets between curbs is thirty-six feet. The distance from the west curb of Ninth Street westward along the sidewalk on the north side of Sidney Street to the east rail of the east street-car track is about forty-two feet. The gauge of both street-car tracks is about four feet ten inches, and the space between the two tracks is about five feet four inches. In other words, from outer rail to outer rail of the double track the whole distance is about fifteen feet, making the west rail of the west track about fifty-seven feet west of the west curb of Ninth Street and about eighty-three feet west of the east curb. There is a street lamp at the northeast corner of the intersection of Ninth and Sidney Streets and another at the southwest corner. The latter of these lamps is about sixty-seven feet from the scene of the accident and the former about ninety-seven feet.

On the occasion in question the respondent was walking west on the sidewalk on the north side of Sidney Street, intending to go to the regular stopping place for southbound street cars and there to take passage on one of said cars. As he stepped off the curb on the east side of Ninth Street he looked northward and saw a street car coming some distance away. According to his story, he continued on west walking along the sidewalk and saw two men standing at the regular street-car stopping place. As he had just reached the west rail of the west track, the street car struck him. The respondent was the only witness who testified as to the actual collision. But before setting out further his account of the accident, we would better refer to the testimony of his other witnesses who told of the movement of the street car.

Four of the witnesses who were passengers on the street car said that after it turned off of Ninth Street and headed across the vacant lot it was moving at a speed of from ten to fifteen miles per hour. The gong was not sounded. One of the passengers said the first notice he had of the collision was from the sudden application of the brakes. This witness and two others testified the wheels made two short bumps as if they had passed over something on the track. The two witnesses last mentioned said their attention was first attracted

by this bumping of the wheels. It is not clearly stated in the testimony whether the brakes were set before the street car struck the plaintiff or afterward. But it is certain they were vigorously applied as the car came to a stop in ten, fifteen or twenty feet. All the witnesses agreed that the front end of the car after it stopped was projecting out into Sidney Street about ten or fifteen feet south of the north curb, which would be sixteen to twenty-one feet south of the middle of the sidewalk.

The passengers practically all got out. The plaintiff was lying with his foot on or near the east rail of the west track about midway between the front and rear trucks. His head and body projected to the east toward the west rail of the east track. The point is indicated on the plat by the line marked with the letters F and H. It was dark and some of the passengers lit matches to aid their view. One of them testified it was very dark, but later said it was about dusk and that after he got out of the street car on to the street he could see a man walking as far as ninety or one hundred feet away; another witness said fifty or seventy-five feet away. We take judicial notice of the fact that the sun set at 5:04 o'clock that evening.

Corroborating the respondent two of the passengers said that when they got off the car immediately after the accident two men were standing at the regular stopping place for persons intending to board the car at that intersection. One of these witnesses further stated that when the street car left the scene of the accident later and proceeded south two men boarded the car, but he did not say and apparently was unable to say whether the two men who got on the street car were the same two persons he had previously seen standing there. Both of these men must have been eye witnesses to the collision, but neither of them was called as a witness. However, there is nothing in the record to show that the respondent ever learned who they were or could have obtained their testimony unless it be this: several of the witnesses said policemen appeared on the scene shortly after the accident and took their names, and that through this source the plaintiff learned their identity.

The plaintiff used as a witness a man named Ralph Derbes, who had been a motorman on the street-car lines operated by the defendant receiver for a little over three years and a half prior to August, 1923. He testified he was familiar with the equipment of street cars of the type that figured in the accident and with the scene of the accident. He said at that place a car going ten miles an hour could be stopped on a dry rail in between twenty and twenty-three feet, and at fifteen miles an hour in between thirty-five and thirty-eight feet. The car which struck the plaintiff was No. 2318, and was forty-eight feet long. The witness said the headlights on some of the 2300 series of street cars will give a clear view for about fifty feet ahead and on others 150 or 200 feet; and that the way the

lights shine the rays are thrown straight ahead. He declined to testify how far the headlight on street car No. 2318 would carry.

Now getting back to the plaintiff's story. On direct examination he said:

"I walked over Broadway to Sidney and up Sidney, and I seen the car coming, and I started to cross the street, and the car, I guess, was about seventy-five feet down there, and when this car ran right over me I was right on the pedestrian's walk.

"Q. How far was the car away from you when you saw it? A. About seventy-five feet, I guess.

"Q. And where were you at that time? A. Well, I was about the last track east on the northbound.

"Q. Walking in which direction? A. West.

"Q. And then what happened? A. Well, I kept walking on across and the car ran right down on me and over me."

On cross-examination his testimony was as follows:

"Q. When was it that you first saw the street car—the southbound street car? A. Well, I seen it coming just as I stepped off the curb, I guess, but it was a good ways down there at that time.

"Q. You saw it coming as you stepped off of the curb on the east side of Ninth Street? A. Yes, sir. . . .

"Q. All right. Now, as you stepped off there, you saw the southbound street car approaching? A. Yes, sir.

"Q. About where was the southbound street car at that time? A. I couldn't tell you where it was at that time. I couldn't judge the distance, how far down it was.

"Q. Was the headlight burning on the street car? A. Yes, sir.

"Q. Had you noticed the speed at which it was traveling? A. No, sir.

"Q. But you saw the headlight? A. Yes, sir.

"Q. Now, how far north of the usual stopping place for passengers would you say the street car was at that time? A. You mean when I stepped off of the first side?

"Q. When you stepped off of the curb. A. Well, I couldn't judge how far it was down when I got off of the curb."

(Here follows dialogue between counsel and ruling of court concerning use of a deposition.)

"Q. Well, then, having read that, does that refresh your memory as to how far the street car was north of the usual stopping place at the time you first saw it? A. Yes, sir."

(Further argument between counsel.)

"Q. Now, Mr. McGowan, just tell me how far north you say the street car was at that time? A. About two car-lengths from the regular stopping place.

"Q. About two car-lengths north of the regular stopping place? A. Yes."

(Further argument between counsel.)

"Q. Now, you had boarded street cars at this corner before, had you not? A. Yes, sir.

"Q. You were familiar with the place where they ordinarily stopped, the southbound street cars on that occasion? A. Yes, sir.

"Q. You observed, as you stepped off of the curb, that the street car was in motion—that it was running—in motion? A. Yes, sir.

"Q. And you saw the headlight and all the lights in the car burning; is that right? A. I saw the headlight; yes, sir.

"Q. Now, did you walk right straight west across Ninth Street or did you angle across the street? A. I walked right straight across on the pedestrian's walk; yes, sir.

"Q. Walked right straight west? A. Yes, sir.

"Q. Did you continue to watch the car? A. Well, I didn't— I continued to watch it, but I thought the man was coming to a stop there.

"JUDGE GREEN: Well, I move to strike out what he thought.

"THE COURT: Yes.

"JUDGE GREEN: I ask to have the jury instructed to disregard it.

"THE COURT: Yes. Just state what you saw.

"Q. Did you continue to watch it? A. Yes, sir.

"Q. You were watching it all the time, were you? A. No, sir, not particularly; no, sir.

"Q. Well, did you or did you not look at that street car as it was approaching?

"THE WITNESS: Well, of course, a man will look up and down the street when he is crossing the street, but I couldn't get that in my mind, whether I did or not.

"Q. Then you want the jury to understand that you don't know whether you watched it all the time?

"No response.

"Q. What is your answer, Mr. McGowan, as to whether you watched it all the time or not?

"No response.

"THE COURT: If you remember?

"MR. SCHWARTZ: He tried to say it, over objection. He said he thought it was going to stop.

"JUDGE GREEN: That is argument of the case. If Mr. Schwartz keeps on with these kind of tactics I am going to move to discharge this jury.

"MR. SCHWARTZ: He gets this boy all excited.

"JUDGE GREEN: I am not getting him excited. This is a simple question, whether he continued to watch the street car or not.

"Q. Just tell the jury whether, as you crossed that street, you continued to watch that approaching street car? A. Well, I guess I was watching it.

"Q. Well, I don't want your guess. Did you or did you not continue? You know.

"No response.

"Q. What do you say? A. Well, I was watching it, then.

"Q. All the time? A. Yes, sir.

"Q. Did you walk or run? A. Walked.

"Q. All the way? A. Yes, sir. . . .

"Q. Did you walk all the way across the street? A. Yes, sir.

"Q. Did you run at any time? A. No, sir.

"Q. You signed this deposition, I believe you, said? A. Yes, sir.

"Q. So you continued to watch the street car approaching and continued to walk toward the street car tracks on which the car was approaching; is that right? A. Yes, sir.

"Q. How far away was the street car from you at the time you stepped on the street car tracks? A. Which track do you mean?

"Q. The tracks on which the street car was coming, the southbound street car tracks? A. I don't know how far it was away from me.

"Q. Haven't you any idea? A. No, sir.

"Q. Well, do you mean to tell the jury that at the time you stepped on the street car tracks you have no idea how far that street car was away? A. Well, when I stepped on that southbound track the street car was right on top of me at that time.

"Q. The street car was right on top of you? A. Yes, sir. I just got across to the other side of the west track on the southbound when it hit me.

"Q. Well, we will take the east rail of the southbound street car tracks. That is the rail on the side nearest you as you approached? A. Yes, sir.

"Q. As I understand it, you were watching the street car as you went across the street. How far north of you was this street car at the time you stepped over this east rail? A. Well, it was about seventy-five feet, I guess.

"Q. Seventy-five feet north of you? A. Yes, sir.

"Q. Do you mean that you only had to cover the space between the two rails— A. (Interrupting) No, sir. From the eastbound rail, I mean.

"Q. Well, I said the east rail of the southbound street car tracks? A. I misunderstood you. I thought you meant the northbound tracks.

"Q. No. I mean the east rail of the southbound street car tracks. That is the east rail of the tracks on which this car was running? A. Well, when I got to that track the car was pretty near right up on me.

"Q. Well, how far would you say it was away from you? A. Well, it was just away from me far enough that I got to the other side of the track when it hit me.

"Q. Well, can you give us any idea in distance? A. No, I couldn't give you any idea.

"Q. Could you point out anything in the room— A. (Interrupting) When I seen the car was about to hit me I got so excited I don't know how far it was.

"Q. You didn't know it was going to hit you before you stepped on the rail? A. No, sir; I was already on the rail.

"Q. I am asking you how far it was away when you stepped on those tracks? A. I couldn't judge how far it was away. I could not say, because it made me so nervous and excited."

(Argument of counsel.)

"Q. So, as I understand you, all you will say is that it was right up against you, but how far, you don't know? A. I don't know; no, sir.

"Q. But it was still running when you stepped on those tracks? It was still in motion? A. Certainly.

"Q. Did you notice any change in the motion of the street car from the time you first saw it until you were struck?"

(Argument of counsel.)

"Q. Did you see the street car slacken its speed any as it approached there? A. No, sir.

"Q. Now, did you run as you went across the street-car tracks? A. No; I never run when I got to the street-car tracks; no, sir.

"Q. Did you run as you crossed the southbound tracks; that is, the one on which the street car was approaching? A. No, sir.

"Q. Did you continue walking as you went over that street-car track? A. Yes, sir.

"Q. And you never increased your speed then at any time? A. No, sir; just an ordinary man's walk.

"Q. And seeing this street car approaching, and with the head-light burning, and without any change in its speed, you deliberately walked on that street-car track in front of that street car; is that correct? A. Yes; if it is you can put it that way.

"Mr. Schwartz: Well, what is that answer? I didn't hear it.

"The Court: He said, 'Yes, if you can put it that way.' "

On redirect examination by his own counsel the plaintiff said:

"Q. I will put it in a new way. Charlie, do you know, of your own knowledge, on this evening whether the car slowed up any, or went any faster, or kept going at the same rate of speed, at the time you were struck? That is, whether there was any change in the movement? Do you know whether there had been any change in the movement, with reference to its speed, from the time you first saw it

until you were struck? A. Well, I think it just kept about the same speed it was going when I first saw it.

"Q. You think it did. You don't know, do you? A. I couldn't say."

I. The appellant's first point in support of his proposition that a demurrer to the evidence should have been sustained is that the respondent was guilty of contributory negligence as a matter of law. We shall not go into this question because the case was submitted solely on the humanitarian doctrine, and contributory negligence is not a defense under that doctrine. [Schulz v. Smercina, 318 Mo. 486, 500, 1 S. W. (2d) 113, 120.]

II. The next point made is that the respondent admitted he saw the street car all the time, knew it was continuing at undiminished speed, and yet with this knowledge walked directly into its path. It is contended that one who thus knowingly and unnecessarily places himself in, or remains in, a position of imminent peril, cannot invoke the humanitarian doctrine. Some of the cases cited support that view. [Watson v. M. C. St. Ry. Co., 133 Mo. 246, 251, 34 S. W. 573, 574; Kinlen v. Met. St. Ry. Co., 216 Mo. 145, 164, 115 S. W. 523, 530; Reeves v. K. C. St. L. & C. Railroad Co., 251 Mo. 169, 177-8, 158 S. W. 2, 4; Karte v. J. R. Brockman Mfg. Co. (Mo.), 247 S. W. 417, 423.] But the later decisions are to the contrary. It is held in Banks v. Morris & Co., 302 Mo. 254, 267, 272, 257 S. W. 482, 484, 486, a banc case, and several others since decided, that under the humanitarian doctrine the cause of the injured party's peril is immaterial (save, perhaps, when he voluntarily seeks injury, as with the intent of committing suicide or collecting insurance).

III. It is next contended that even if the humanitarian doctrine be applicable, yet the facts do not make a case under it, because the evidence fails to show the appellant's motorman saw or should have seen the respondent in a position of imminent peril in time to have avoided injuring him by the exercise of ordinary care. There is no direct proof as to when the motorman saw the respondent. The inference to be drawn from the fact that the brakes were not applied until about the time the car struck him, is that the motorman did not actually see him until too late. But when should he have seen him, and what could he have done afterward? That depends on when the respondent entered the danger zone, where the street car was at that time, its speed, and the time and space within which it could have been stopped or slowed up sufficiently to clear him.

We think it should be said the respondent did not enter the danger zone until he took the last step or so before going into the course the car would take: this on authority of such cases as Eckhard v. St. L. Transit Co., 190 Mo. 593, 618-9, 89 S. W. 602, 610; Keele v. A., T. & S. F. Ry. Co., 258 Mo. 62, 79, 167 S. W. 433, 438; Lackey v. U. Rys. Co., 288 Mo. 120, 143, 231 S. W. 956, 962; State ex rel. St. L. & S. F. Ry. Co. v. Reynolds, 289 Mo. 479, 489, 233 S. W. 219, 222; Clark v. A. T. & S. F. Ry. Co., 319 Mo. 865, 878-9, 6 S. W. (2d) 954, 960.

The respondent has cited a number of cases in which wider limits were set, but in view of their facts they are not in point. We shall refer to only a few of them. In Bode v. Wells (in Banc), 322 Mo. 386, 15 S. W. (2d) 335, 337, an elderly woman, seventy-five years of age, started across a double street-car track in midday to board a street car at the usual stopping place. She signaled the motorman by waving her umbrella. The street car was then about 300 feet away running twenty-five miles per hour and could have been stopped in seventy-five feet. It was held the danger zone was not bounded by the near rail of the track where she was struck because it was easy to see she intended to cross the tracks.

In Goggin v. Wells (St. L. Ct. Apps.), 249 S. W. 702, the plaintiff started across double street-car tracks on Manchester Avenue in St. Louis at night, to board a street car at a regular stopping platform on the south side thereof. A man already there had motioned the car to stop. The course of the plaintiff, the location of the platform and the general surroundings were such that the motorman should have known the platform was his objective and that he was going to cross the tracks. It was held under "the particular circumstances" that the danger zone began at the north rail of the north track instead of the north rail of the south track on which the plaintiff was struck as he got nearly across.

Respondent stresses the fact that in the instant case the testimony showed two men were standing at the stopping platform, and points to the Goggin case, supra, and to Unterlachner v. Wells, 317 Mo. 181, 197, 296 S. W. 755, 761; Mason v. U. Rys. Co. (Mo.), 246 S. W. 318, 323; Lackey v. Wells, supra (288 Mo. l. c. 141, 231 S. W. l. c. 962), and McDonald v. U. Rys. Co., 211 Mo. App. 149, 157, 161, 245 S. W. 559, 560, 561. These decisions all held under their facts that the presence of prospective passengers at a regular stopping place warranted one about to cross the tracks in assuming the car would stop. And so the respondent argues he was warranted by the facts of this case in assuming the car would stop; and that the motorman, on the other hand, knowing the car would not stop, should have realized appearances were deceiving and should have taken precautionary measures accordingly. In a nutshell the contention is that the circumstances enlarged the danger zone.

We do not think this is so. When the cases say one in the high-way may assume a street car will stop for the reason mentioned, they mean unless he has knowledge or notice to the contrary. If he sees the car is not stopping, in time to stop himself, he cannot assume away what his senses tell him. Authorities last above and Epstein v. Wells (St. L. Ct. Apps.), 284 S. W. 845, 847. Two factors must enter into a case under the humanitarian doctrine: (1) the injured party must actually be in or entering a position of imminent peril, (2) and the defendant must have actual or constructive notice of his peril.

In the instant case the respondent was watching the car all the time. He had a good view, well from the side—not head-on—as the plat shows. He saw it did not appear to be checking its speed. He did not signal the car. He was not running or hurrying. He was walking at an ordinary gait along the public sidewalk, which continued on down the street beyond the platform. He was young and able-bodied, was undistracted by any confusion of traffic, had full control of his movements, and could have stopped in an instant. The car was moving at the moderate speed of ten to fifteen miles per hour. If, as respondent's evidence showed, the *shortest* distance in which the car could have been stopped was twenty to thirty-eight feet, it is fair to assume an ordinary service stop would have re-required more distance than that. When the car did not stop and the respondent was in a position to know it was not stopping; when the motorman, if looking, must have seen the respondent looking at the car, he was not bound to anticipate he would walk in front of it. From the respondent's description of the occurrence we are of the opinion there was nothing in his appearance or conduct which should have led a reasonably prudent motorman to believe he would act otherwise than with due regard for his own safety—until he reached the danger zone applicable to the ordinary case.

The overhang of the car was about one and one-half feet, appellant's counsel say in their brief. Approaching within a step or two of that line would put the respondent within about five feet of the east rail. That was the limit set in Hoodenpyle v. Wells (St. L. Ct. App.), 10 S. W. (2d) 331. We think it is as close to right in this case as can be set in figures.

How far away was the street car when the respondent entered the danger zone. In his first testimony he said it was seventy-five feet north of him when he started across Ninth Street. Then he said he thought it was a good ways to the north at that time, but he couldn't judge how far. Being reminded of a deposition he had previously given he fixed the distance at two car-lengths (ninety-six feet) north of the stopping platform. Twice he said the car was seventy-five feet away when he reached the east rail of the east or northbound track. And he said when he reached the east rail of the west or south-

bound track the car "was right on top of me," and again, that it "was pretty near right up on me." He said he was so nervous then that he could not estimate the distance.

There is another way of getting at it. We can take judicial notice of the fact that the ordinary walking speed of the average man is two to three miles per hour, more nearly the latter. According to the testimony the car was going ten to fifteen miles per hour, or five times as fast. From the place where the respondent entered the danger zone about five feet east of the east rail of the west track he went nine or ten feet to the west rail before he was hit. So in that same time the street car travelled forty-five to fifty feet. That is to say it was that far back when he entered the danger zone. These figures check pretty well with the respondent's testimony that the car was seventy-five feet northward when he crossed the east rail of the east track. In going from there to the west rail of the east track where the danger zone began he travelled five or six feet and the street car twenty-five or thirty feet. That subtracted from the seventy-five feet gives forty-five to fifty feet, as do the other figures.

We realize there is nothing certain about these computations. There are too many variable factors. Then, also, it is to be remembered an appreciable time was required for the motorman's mind and muscular system to act and for the brakes to be set. We can take judicial notice of that. [Vale v. Noe, 172 Wis. 421, 424, 179 N. W. 572, 573.] If the brakes were applied before the collision the car must have run progressively slower afterward. When the respondent saw the car close on him it seems he would have hastened, though he says he did not and he may have been paralyzed with fright. But his statement that the car was "right on top of me" when he started across the west track does not necessarily mean it was so close nothing could be done, in view of his excited condition, the glaring headlight and the other evidence. The car could have been brought to a complete stop in twenty to thirty-eight feet. One leap or two steps would have put him in the clear. The case is close, but we think it was for the jury to say.

IV. The next assignment of error is directed to the closing argument of respondent's counsel. The following occurred: "MR. SCHWARTZ: I respect my friend, Judge Green, a good deal, but he has certainly got a lot of nerve to come in here before twelve men, who pass solely on the facts, and say, 'Well, there are no facts upon which you can give the plaintiff a judgment. I am carrying your load, and don't you dare return a verdict in favor of the plaintiff, because, in my judgment, the plaintiff hasn't got a case.' If the court thought that, he would take this case away from the jury. If it wasn't a question of fact for twelve men—

"JUDGE GREEN (interrupting): Wait a minute, now. I not only move that Mr. Schwartz be reprimanded for making that argument, but I move that a mistrial be declared, because that is highly improper argument, and Mr. Schwartz knows it is improper argument, and I therefore move the court that the jury be instructed to disregard that statement by Mr. Schwartz, and that a mistrial be declared because of that improper argument on his part.

"THE COURT: The court will instruct the jury to disregard the statement. The motion to discharge the jury will be overruled. (Exception saved.)

"MR. SCHWARTZ: If there was not a question of fact for the jury to pass on, the case would not have been submitted to a jury. Now, that is the law. There is a question of fact here.

"JUDGE GREEN: He is repeating the very thing that the court told him not to do.

"THE COURT: Confine yourself to the evidence and the instructions.

"JUDGE GREEN: I ask to have the jury instructed to disregard that.

"THE COURT: That will be the order.

"JUDGE GREEN: And I again ask the court to order a mistrial by reason of this improper argument of Mr. Schwartz.

"THE COURT: That will be overruled. (Exception saved.)"

Considering the circumstances of this case we think the refusal of the trial court to discharge the jury was erroneous and that the cause should be reversed and remanded for that reason. The appellant had stood on a demurrer to the respondent's evidence and introduced no testimony. The case was exceedingly close. As shown by the quoted remarks of respondent's counsel, what appellant's counsel had previously said to the jury was that the plaintiff didn't have a case "in my judgment." To that respondent's counsel answered in effect that the *court* thought there was evidence which would entitle the jury to find for appellant. He said that not once but twice, the second time after the court had held the argument was improper.

The argument was improper. There is not a case cited by either side in which such practice is not condemned, though sometimes the error is held to be cured or not reversible. In this case it was reversible error on authority of such decisions as Neff v. City of Cameron, 213 Mo. 350, 369, 371, 111 S. W. 1139, 18 L. R. A. (N. S.) 320, 127 Am. St. 606, and Kull v. Ford Motor Co. (St. L. Ct. App.), 261 S. W. 734, 736.

In the former case counsel for respondent in closing argument said to the jury: "You gentlemen notice that for the last few days Mr. Ellis (of counsel for appellant) has been objecting and has been overruled." Appellant objected, but the trial court apparently did

not rule on the objection. This court reversed and remanded the cause, saying:

"What, may we ask, did that mean except this: 'You notice, gentlemen of the jury, that Ellis is wrong in the way he is trying this case. You see, gentlemen, we have the court with us, and that makes the path of duty plain to you.' That was a mischievously unfair argument and the court in its own dignity and right should have stopped counsel even though no objection was made. Suppose learned counsel had told the jury that the court was favorable to plaintiff's view of the case and thus have put into the jury's mind the personal views of the court to weigh down the scales of justice against defendant city? Would that not be a reproach of the law? Yet how much less harm was it to call the attention of the triers of fact away from the facts and fasten it upon the rulings of the court with which they had no concern.''

In the only decision on the precise point cited by respondent, Gerber v. Kansas City, 304 Mo. 157, 175, 263 S. W. 432, similar argument of counsel was criticized, but the error was held not prejudicial, because the trial judge immediately instructed the jury that he had not undertaken to instruct them how they should construe the evidence; and the written instructions pointedly conditioned the respondent's right to a verdict upon a finding from the evidence of the specific fact to which the argument was directed. But for counsel in argument in any guise or form to tell the jury what the court thinks about the sufficiency of the evidence for any purpose is highly improper, as every lawyer well knows. Its effect on the jury in a close case can hardly be doubted. We are clearly of the opinion that the appellant was prejudiced.

The other questions raised need not be discussed.

Reversed and remanded. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.