LENA C. MEEK, Administratrix of the Estate of JAMES C. MEEK, v. THE NEW YORK, CHICAGO and ST. LOUIS RAILROAD COMPANY, a Corporation, Appellant.—88 S. W. (2d) 333.

Court en Banc, November 20, 1935.

*Sullivan, Reeder & Finley* and *Jones, Hocker, Gladney & Jones* for appellant; *W. J. Stevenson* of counsel.

*Allen, Moser & Marsalek* and *Charles L. Moore* for respondent.

FRANK, J.—Action by Lena C. Meek, administratrix of the estate of her deceased husband, James C. Meek to recover damages for the death of her said husband. She recovered a judgment for $25,-000 and defendant appealed.

The action was brought for an alleged violation of the Federal Safety Appliance Act, U. S. C. A., Title 45, Section 2, in that defendant as a common carrier engaged in interstate commerce by railroad, was hauling and using on its railroad, cars which were not equipped with couplers that would couple automatically by impact without the necessity of men going between the cars. No contention is made that the petition does not state facts sufficient to charge that Meek's death was caused by a violation of the Federal Act, therefore, it is not necessary to either reproduce or discuss the allegations of the petition. The petition being based upon a violation of the Federal Act, the rights of the parties must be determined by the decisions of the Federal Courts.

■ Appellant contends that the Circuit Court of the City of St. Louis, Missouri, had no jurisdiction of this cause for the reason that Meek was killed in Indiana; that all of the witnesses in the cause reside in that state, and that the trial of said cause in St. Louis was an undue burden on interstate commerce. Michigan Central Railroad Co. v. Mix, 278 U. S. 492, and Denver & R. G. Railroad Co. v. Terte, 284 U. S. 284, are cited in support of this contention. The cited cases are not in point. An examination of their facts will show that the only business transacted in Missouri by the railroads in question, was the solicitation of traffic by a soliciting agent. It is settled law that the ''presence in the State of a mere soliciting agent and nothing more, does not make a foreign corporation present in the State, so as to subject it to a suit and process of the local or State courts.'' [State ex rel. Foraker v. Hoffman, Judge of the Circuit Court, 309 Mo. 625, 637; Michigan Central Railroad Co. v. Mix, 278 U. S. 492.] But such is not the situation in the instant case. It is admitted in this case that defendant was a foreign corporation engaged in interstate transportation, and the record shows its presence in this State transacting therein the business ordinarily connected with the operation of a carrier by railroad. Such a showing gave the Circuit Court of the City of St. Louis jurisdiction to which defendant must submit although thereby interstate commerce might be incidentally burdened. [Hoffman, Judge, v. State of Missouri ex rel. Foraker, 274 U. S. 21, 71 L. Ed. 1025.]

■ The only contention made by defendant on the merits is that no case was made for the jury.

Plaintiff's evidence shows that she was the duly appointed, qualified and acting administratrix of the estate of her deceased husband. Defendant's answer admits that it was a corporation duly organized and existing by virtue of law, and at all times mentioned in the petition was a common carrier by railroad; admits that James C. Meek was killed on January 11, 1930, while employed by defendant in interstate commerce.

James C. Meek was killed on January 11, 1930, at about seven-thirty o'clock P. M., while working as a member of defendant's switching crew in the yards at Marion, Indiana. Defendant railroad is referred to in the record as the ''Nickel Plate.'' One of its tracks running north and south is referred to as the ''Nickel Plate Belt,'' which, for the purposes of the case, we will call the main track. An interburban car track running east and west crosses this main track at right angles. For convenience we will hereafter refer to this crossing as the interurban crossing. There are switch tracks extending off the east side of the main track both north and south of the interurban crossing. We may begin the story of the switching movement in which Meek lost his life, with an engine and sixteen cars standing on the main track a considerable distance south of

the interurban crossing. Seven of these cars were ahead and nine were behind the engine. The engine was facing the north. Ten of these sixteen cars were to be delivered to the ''C. & O. connection'' which was located a considerable distance north of the interurban crossing. These ten cars were not together but were scattered through the string of sixteen cars promiscuously. The purpose of the switching movements was to get all the cars ahead of the engine with the ten cars which were to be delivered to the C. & O. in the lead in order that they might be pushed northward and delivered to the ''C. & O. connection.'' Meek and the other members of the switching crew were to do this job of switching. The lead car ahead of the engine, not being one of the ten to be delivered to the C. & O., it was shoved onto a switch track leading eastward off the main track. The next four cars were to be delivered to the C. & O. Meek was directed to and did uncouple these four cars from the string of cars and they were kicked northward on the main track and left standing there. Plaintiff's evidence is that these four cars stopped at a point north of the interurban crossing, while defendant's evidence is that they stopped south of the crossing. Stevens, the conductor, directed Meek to remain with these four cars while the remainder of the crew finished the switching movements necessary to assemble all of the sixteen cars in front of the engine in the order heretofore indicated. Meek's duty while remaining with the four cars will be later discussed. Truesdale, a member of defendant's switching crew, testifying for defendant, said that the switching movements, four in all, were continued in the same manner the first switching movement was made—that is—by shunting onto the switch track the cars that were not going to the C. & O., and by kicking the C. & O. cars northward on the main track toward the four C. & O. cars that had been theretofore kicked northward thereon by the first switching movement, thereby placing the ten C. & O. cars together; that they then took the six cars which had been shunted on the switch track, placed them on the main track ahead of the engine and behind the ten C. & O. cars.

Plaintiff's evidence as to how Meek met his death tends to show the following facts:

When the first four C. & O. cars were kicked northward on the main track, a Pennsylvania engine was doing some switching on a switch or side track north of the interurban crossing. The Pennsylvania engine pulling four or five cars started off the switch onto the main line for the purpose of backing north on the main line. When the engine and one or two of the cars got on the main line, it was discovered that the four C. & O. cars which defendant left standing on the main line were so near the switch that the Pennsylvania engine with its four or five cars could not come out on the main line far enough to clear the switch, so this engine and string of cars, partly on the main line and partly on the switch track,

stopped with the engine some thirty or forty feet from the north end of the four C. & O. cars standing on the main line, intending to remain there until defendant could pull the four C. & O. cars south a sufficient distance so that the engine and string of cars could come out on the main line far enough to clear the switch and back northward. Harry E. Ballard, a brakeman on the Pennsylvania engine, testified that the headlight on his engine enabled him to see Meek at the north end of the four C. & O. cars which were standing on the main track; that he got off his engine and went to where Meek was and talked to him; that he and Meek then walked to the south end of the four C. & O. cars, and Meek stepped across the track outside of the rail and attempted to open the coupling knuckle on the south end of the south car by jerking on the lift lever, but the coupler would not open; that Meek then stepped to the center of the track and attempted to open the coupler, and he (Ballard) left and went back to his engine and cars. The following questions and answers indicate what Meek was doing when Ballard last saw him:

"Q. At the time he was trying to open this coupler, was he on the outside of the rail the first two times? A. He was.

"Q. What did he next do? . A. He walked back in the center of the track and fooled with it and I walked away.

"Q. Where was his right hand when you last saw him? A. He had hold of the lift lever, like this, yanking on it, when I left, and had hold of the knuckle trying to get it open.

"Q. Where was his left hand as he faced the south end of the car, and where was his right hand in attempting to open the knuckle? A. His right hand would be holding the knuckle and his left hand holding the lever."

Ballard further testified that when he left Meek working with the coupler, he (Ballard) walked back north to the switch (a distance which defendant says was 260 feet), and about the time he arrived there, defendant's switch engine shoved cars against the south end of the four standing cars where Meek had been working with the coupler, with such force that the four cars were shunted against the Pennsylvania engine hard enough to ring the bell thereon and bump the cars attached thereto. Ballard further testified that defendant's switching crew then pulled defendant's cars back south far enough to allow the Pennsylvania engine and cars to come out on the main track and back north thereon, and defendant's crew then followed the Pennsylvania northward on the main track and delivered its cars to the C. & O. connection. No one knew at that time that Meek had been killed.

Defendant's brakeman, Truesdale, testified that when they reached the C. & O. connection, they discovered that Meek was not with them, and fearing that something had happened to him, they backed the engine to the south and by the aid of the headlight on the tender,

discovered Meek's dead body between the rails on the main track about one hundred fifty feet north of the interurban crossing. Distances appearing in the record show that the point where Meek's body was found was approximately the place where he was last seen trying to open the coupler.

Meek was killed about seven-thirty P. M. Plaintiff's witness Ballard and one Wells, both brakemen on the Pennsylvania engine, testified that they heard of Meek's death later that evening, and when they quit work about nine o'clock P. M., they went to the C. & O. connection and examined the cars which defendant had placed there, and found flesh and fresh blood on the coupler of the tank car No. 5574.

Gladys Hewitt, Meek's stepdaughter, testified that Meek's right hand was badly crushed.

Other facts necessary to a determination of the questions raised, will be stated in connection with the discussion of such questions.

Contention is made there is no proof that the car and coupler on which Ballard and Wells testified they found flesh and fresh blood was the same car on which Ballard saw Meek trying to open the coupler.

On direct examination Ballard testified that when he and Wells examined the cars at the C. & O. connection, they found flesh and fresh blood on the coupler of the tank car; that the flesh and blood were on the west end of the car as it stood on the C. & O. connection, which would have been the south end of the car as it stood down in the yards, because in delivering it to the C. & O. connection it was shoved east around a curve. On cross-examination he said he remembered what kind of a car it was; that it was the same car he saw down in the yards; that he would have to remember from that night out there what kind of a car it was to know it was the same car, but he would not have to remember the number of it. On re-direct examination he testified that the flesh and blood "was on the same end of the car where I had last seen him."

Witness Wells also testified to seeing the flesh and blood on the coupler of the tank car.

Defendant does not contend that there are other facts and circumstances in the case which conclusively show that the car on which the witnesses found the flesh and blood was not the car Ballard saw Meek working on. The contention is that Ballard assumes it was the same car, but his evidence affords no proof of that fact. We cannot agree with this contention. Ballard positively testified that it was the same car. Other facts in evidence corroborate Ballard's statement. Meek was seen very shortly prior to his death, with his right hand on the coupler and his left hand on the lever trying to open the coupler. His right hand was badly crushed and fresh blood and flesh were found on the coupler within approximately two hours after his death. Ballard's positive testimony that it was the same

car, together with the other facts we have just mentioned amount to substantial evidence that the car on which the fresh blood and flesh were found was the same car on which Ballard saw Meek working immediately prior to his death. Ballard further testified that when he left Meek working with the coupler, he "walked right straight down" to the switch stand by his train, and about the time he got there the four cars bumped into his engine. Defendant says the distance he walked was at least 260 feet. While there is no express testimony as to how long it took him to walk the 260 feet, we take judicial notice that the ordinary walking speed of the average man is approximately three miles per hour. [McGowan v. Wells, 324 Mo. 652, 666, 24 S. W. (2d) 633.] At three miles per hour, it would take slightly more than one minute to walk 260 feet. Defendant says that after Ballard walked back to the switch and had stood there "maybe a minute," he heard the impact of the cars. While he did say he stood there a little bit, a minute or so, yet in the same answer, and without further questioning he said, "I hadn't much more than got down there than they bumped into the cars." The next questions and answers appearing in his cross-examination are:

"Q. Did you walk straight down? A. Yes.

"Q. And as soon as you got there you heard the bump? A. Yes."

Ballard's evidence, taken as a whole, shows the sense in which he used the word "minute" and warrants the inference that he heard the crash at the time he arrived at the switch.

Defendant contends that it cannot be found that the defective coupler was the proximate cause of Meek's death without piling inference upon inference and thus resorting to guess and speculation.

We fail to see the force of this contention. The fact that when Meek was last seen he had his right hand on the knuckle and his left hand on the lever is shown by positive testimony. The fact that defendant's engine and cars bumped into the car upon which Meek was working is shown by positive testimony. The only fact that is left to inference is whether or not Meek remained in the position he was last seen at the coupler, for the short period of time, perhaps a little more than a minute, from the time he was last seen until the impact occurred. Evidence that he was last seen between the rails with his right hand on the coupler; that his right hand was badly crushed; that fresh blood and flesh were found on the coupler, and that his body was not run over by the wheels of the cars, but was found between the rails, justified the inference that he remained in the position he was last seen at the coupler until he was killed in less than two minutes thereafter.

Appellant argues that Meek's whole duty was at the north and not at the south end of the string of four cars.

The evidence touching that question from defendant's conductor, Stevens, is as follows:

"Q. What did he do? A. I told him to uncouple behind the

fifth car with merchandise and gave him the number of it, and that that is what we do.

"Q. What did you then do? A. He gave us the back-up signal and I sent him down and instructed him to stay down there and we would follow him over.

"Q. You said you had told Meek to go up to the front end? A. Yes. *That was for him to be down there and get ready*. (Italics ours.)

"Q. You didn't put him down there to give the Pennsylvania any signals to stop? A. That was his duty if the Pennsylvania came out and didn't see those cars and we had no lights on them.

"Q. Wasn't it his duty to see that *all the knuckles* were open so they made good couplings? A. No. Mr. Meek wasn't doing the switching."

Meek knew that other cars were to be coupled on the south end of the string of four cars, because he had been told what was to be done. It appears from above testimony that it would have been Meek's duty to signal the Pennsylvania train in event it came off the switch onto the main track, and its crew did not see the four cars standing on the main line. However, his duty in that regard was fully performed when the crew on the Pennsylvania engine discovered the presence of the four cars standing on the main track, and stopped their engine until defendant could pull the four cars further south. The fact that defendant's conductor said that it was not Meek's duty to see that *all the knuckles* were open does not show conclusively, as a matter of law, that it was not his duty to see that *the one knuckle* on the south end of the string of four cars was open. Especially so in view of the fact that he was a member of the switching crew; that he knew cars were to be coupled on the south end of the string of four cars; that his full duty had been performed at the north end of the four cars; and, as defendant's conductor says, "*That was for him to be down there and get ready.*" Clearly, it was a question for the jury to say whether or not Meek was in the line of his duty while attempting to open the coupler.

Defendant contends that Meek could not have been killed in the manner claimed by plaintiff, and attempts to support the contention by the evidence of its own witnesses. The trouble with this contention is that it wholly ignores the evidence of the plaintiff which the jury had a right to believe, and is based entirely on defendant's evidence which the jury had a right to disbelieve. The story told by plaintiff's witnesses made a case for the jury. If the record revealed physical facts or undisputed facts such that we could say, as a matter of law, that plaintiff's evidence could not be true, a different question would be presented. But such is not the case. The record presents a disputed question of fact as to how the switching movement which resulted in Meek's death was made, the determination of which was for the jury.

The only contention made by defendant on the merits of the case

is that the trial court erred in refusing to give its requested instruction in the nature of a demurrer to the evidence. In our statement of facts we purposely omitted facts favorable to the defendant, and stated the case in a light most favorable to plaintiff. She is entitled to have that done.

Our conclusion is that on the facts stated plaintiff made a case for the jury, and our attention has not been called to any Federal decision which, in our judgment, holds the contrary. For the reasons stated, the judgment below should be affirmed. It is so ordered.

Division One opinion is hereby adopted as the opinion of the Court en Banc. All the judges concur.