252 S.W.2d 529 (1952)
WOFFORD
v.
ST. LOUIS PUBLIC SERVICE CO.
No. 42870.
Supreme Court of Missouri, Division No. 1.
November 10, 1952.
Carroll J. Donohue, H. Jackson Daniel and Salkey & Jones, St. Louis, for appellant.
Barnhart & Wood, C. V. Barnhart, Marvin S. Wood and Robert D. Bransford, St. Louis, for respondent.
CONKLING, Judge.
Carrie Wofford, plaintiff, had judgment for $8,000 against St. Louis Public Service Company, defendant, in an action for damages for personal injuries which resulted from being struck by defendant's westbound motorbus when she was walking north across Market Street, between Garrison and Cardinal Streets, on October 27, 1950, in the City of St. Louis. Defendant has appealed.
*530 It is here contended the lower court erred in submitting the case to the jury at all, and in the giving of instruction No. 2. Defendant also contends the judgment of $8,000 is excessive under the record facts as to the extent of plaintiff's injuries. Plaintiff submitted her case to the jury solely upon instruction 2, on the theory of a violation of the humanitarian doctrine in failing to stop the bus or failing to sound a warning of the dangerous proximity of the bus.
Stated most favorably to the judgment below, the jury could have found that in the late afternoon of the day in question, plaintiff, with her eight year old granddaughter walking on plaintiff's left, slightly in front of her and holding to plaintiff's left hand, started walking north across Market Street [an east and west street] at a point where Montrose Street intersects Market Street from the south; that Montrose does not extend north from Market Street; that before starting across Market plaintiff looked west and observed that all eastbound traffic on Market was held up by a traffic light at Compton, the next street west of Montrose; that plaintiff and her granddaughter walked north and across Market to the white centerline of Market where they stopped and were briefly held up by the flow of westbound vehicle traffic moving on the north side of Market;
That a westbound motor car moving in the southernmost lane for westbound traffic then stopped to permit plaintiff and the child to cross to the north in front of it. Plaintiff testified that the driver of that car "beckoned for us to go on across, and then another car came up to the side of this other car and it stopped too. Q. Were those two cars at that time side by side? A. Side by side. Q. Both facing, facing the same way A. Both of them told me to go on across, so I did, and when I got to this second car, I started, and didn't stop, but I glanced [east] and I didn't see anything." When plaintiff glanced east when in front of the second stopped car [which was a Ford car in the center lane of the westbound traffic] she saw "about seventy five feet"; and there was no vehicle in the third and last westbound traffic lane within the distance she saw. Plaintiff then looked to the north and walked on north until both were struck by defendant's motorbus moving west in the third traffic lane and next to the north curb of Market. Her hearing was good but plaintiff heard no horn sounded by any vehicle prior to being struck. From a point in front of the motor car in the center lane plaintiff walked north about ten feet before being struck. When the bus stopped it was about 2 feet from the curb and plaintiff was on the street south of the bus and about halfway back, near its center; and she never saw or heard the bus before it struck her. Plaintiff was taken to a hospital, then to her doctor's office and then to her home.
Defendant's operator of the bus which struck plaintiff testified that the collision occurred close to dusk but that the bus lights were not on and were not then needed; that the traffic was heavy; that the bus was being operated westwardly about 2 feet south of the north curb of Market; that "I noticed this Ford automobile [which was moving west in the center lane] start to slow down rapidly * * *. I saw he was going to stop * * *. I put on the brake, and I could see, I could see the danger there, so I applied the brakes, well, as much as I could to get the bus stopped as far as possible." The jury could also have found from the operator's testimony that he saw plaintiff in front of his bus, but that when he first saw her she was "about the left edge," and in front of the left [south side of the Ford automobile]; and that he did not remember sounding his horn and plaintiff was struck by the left front corner of the bus. The bus operator further testified that at his operating position in the bus he could "see over the top of automobiles that are ahead * * * or along the left side"; that the Ford car was moving west in the center lane and was west of the bus; that plaintiff was "twenty to twenty-five feet" west of in front of the left [south] side of the Ford when he first saw her; that she was then moving toward the path of his bus and looking straight ahead [north]. As to the distance in which he could stop the bus, and allowing for reaction time, the operator testified: "The speed I was going * * * safe stopping *531 distance would be approximately forty five or fifty five feet."
Defendant's brief first asserts that the facts of record, and the reasonable inferences to be drawn therefrom, are insufficient to warrant submission to a jury of the question of defendant's negligence in failure to warn or failure to stop.
As to defendant's just above contention, the jury could have found: that the bus operator could and did "see over the top of automobiles that are ahead * * * or along the left side" and out in front of the Ford car; that by his own testimony the bus driver actually saw plaintiff when she was 20 to 25 feet west of and in front of the left side of the Ford automobile; that plaintiff, from that position, walked at least ten feet to the north before being struck by the left front corner of the bus; that plaintiff was looking "straight ahead" toward the north curb of Market and moving toward and into the path of the on-coming bus and did not stop and, therefore, that she was in oblivious peril; that when the bus operator first saw plaintiff she was then not only in oblivious peril but that he realized she intended to proceed into the path of the bus; that under the bus operator's own testimony he "could see the danger there"; that when plaintiff walking north "got to [in front of the south side of] this second car" she looked east, and that in the third traffic lane [next to the curb] there was no car within 75 feet. The bus operator actually saw plaintiff when she was 20 to 25 feet in front of the Ford automobile looking north and moving north, and, so far as the operator saw, plaintiff never looked toward the bus.
From his testimony it was apparent to the operator that she was oblivious and unaware of the approaching bus. When the operator first saw her she was at least 10 feet from the place where she was struck. Under plaintiff's testimony she looked to the east "when I got to this second car," and the bus was then not in sight in the traffic lane next to the curb, and it was therefore more than 75 feet east of the point of impact. Plaintiff moved the last ten feet north to the point of impact at a walk. At the time she started to walk that distance the bus was more than 75 feet away to the east. Plaintiff's rate of walk does not appear but we judicially notice an adult pedestrian will walk from 2.9 to 4.4 feet feet per second. McGowan v. Wells, 324 Mo. 652, 24 S.W.2d 633, 639, Zickefoose v. Thompson, 347 Mo. 579, 148 S.W.2d 784, 792. The jury could therefore reasonably find that after the operator could have seen her in imminent peril plaintiff used an elapsed walking time of more than 2 seconds, during which, if a warning of the dangerous proximity of the bus had been sounded this adult plaintiff, moving at only a walk, could have stopped short of the path of the bus. "The humanitarian doctrine calls into action every means at hand to prevent the threatened injury". Todd v. St. Louis-San Francisco Ry. Co., Mo.Sup., 37 S.W.2d 557, 561, Payne v. Reed, 332 Mo. 343, 59 S.W.2d 43.
It therefore follows from the above that, under these facts and the inferences reasonably to be drawn therefrom, plaintiff made a submissible case upon the theory of the failure to sound a warning. Althage v. People's Motorbus Co. of St. Louis, 320 Mo. 598, 8 S.W.2d 924, 926[5], Burke v. Pappas, 316 Mo. 1235, 293 S.W. 142, Taylor v. Kelder, 229 Mo.App. 1117, 88 S.W.2d 436, Harrington v. Thompson, Mo.Sup., 243 S.W.2d 519, 523, Zumwalt v. Chicago & A. R. Co., Mo.Sup., 266 S.W. 717, Crane v. Sirkin & Needles Moving Co., Mo.App., 85 S.W.2d 911, 914, 915. The facts before us in this case very readily distinguish it from Vietmeier v. Voss, Mo.Sup., 246 S.W.2d 785, where a five year old boy ran rapidly into a street and into the side of a passing motor vehicle.
As noted above, under the evidence in the case the jury could have found that when plaintiff's peril arose and was discoverable by defendant, the bus was at least more than 75 feet east of the point of impact, and, under the bus operator's testimony that, at the speed the bus was moving, it could have been safely stopped in 45 to 55 feet a submissible case was made for the jury as to defendant's negligence in failing to stop. Therefore, viewing all the facts and reasonable inferences to be drawn *532 therefrom in the light most favorable to plaintiff's case, and disregarding defendant's evidence unless it aids plaintiff's case, as we must do on this appeal, we rule that plaintiff made a case for the jury's consideration as to each of the alleged grounds of negligence under the humanitarian doctrine upon which the case was submitted.
It is next contended that plaintiff's submission instruction No. 2 was erroneous in that it improperly broadened the zone of imminent peril, and because it failed to hypothesize sufficient facts to enable the jury to determine when plaintiff came into peril, and when it was that defendant's duty to act arose. Upon this contention defendant relies on such cases as Cable v. Chicago B. & Q. R. Co., Mo.Sup., 236 S.W. 2d 328, and Smithers v. Barker, 341 Mo. 1017, 111 S.W.2d 47.
Defendant seems to base these contentions upon its argument that the instruction was confusing and indefinite, and permitted the jury to speculate as to when peril arose. As a predicate of plaintiff's recovery, the instruction required the jury to find, among other things, that plaintiff.
"was a pedestrian crossing Market Street * * * and * * * was struck by the westbound bus * * * and * * * that prior to being struck * * * plaintiff became and was in a position of imminent peril and danger of being struck * * * by said bus and that defendant's operator
* * * could have seen plaintiff in the * * * position of imminent peril * * * in time thereafter * * to have * * * stopped said bus or to have sounded a warning of the dangerous proximity of said bus and that by so doing could have avoided striking plaintiff * * * and * * * failed to do so and was thereby negligent
* * * and that such negligence * * * directly contributed to cause plaintiff to be struck by said bus * * *." etc.
In addition to the above, at defendant's request, the jury were instructed "that by the term `imminent peril' is meant a place wherein there is certain dangernot a place where there is just a mere possibility of an injury occurring"; and also, that if the bus operator did not see or could not have seen plaintiff when she entered into peril until it was too late for the bus operator to have stopped or sounded a warning, and to have thereby avoided the collision, then the jury's verdict should be for defendant. Whether defendant was entitled to that last instruction we need not discuss.
The cases cited and relied on by defendant are clearly distinguishable upon facts and the instructions there considered, and do not rule the instant situation. We have reexamined the instructions ruled in the cited cases as set out in the various transcripts in our files. Instruction 1 in the Cable case, discussed 236 S.W.2d loc. cit. 334, 335, under the facts of that case permitted the jury to conclude that plaintiff was in a position of peril during all the time the plaintiff there was driving the more than 1,000 feet on the lane and approaching the railroad crossing. Under the Cable case instruction the jury could have found that when plaintiff's truck turned off of the gravel road he entered into peril, and thereafter remained in peril until struck. And in that case the jury were not even instructed that imminent peril means a place wherein there is certain danger. Instruction 1, in Smithers v. Barker, discussed 111 S.W.2d loc. cit. 51 et seq., in substance permitted the jury to conclude that if plaintiff in that case was anywhere in the intersection he was in a position of imminent peril, when in fact, after coming into the intersection, Smithers did stop in complete safety from all traffic, and was not then in peril at all. Limitations upon space forbid specific reference to or analysis of the other cited cases of similar import.
Under the instant instruction, whether and when plaintiff came into imminent peril were properly submitted as questions of fact for the jury to determine. The jury had here first to determine whether plaintiff came into a position of peril. If the jury determined that plaintiff did in fact come into peril, it then had to determine whether such peril of plaintiff was discoverable by defendant "in time thereafter" for defendant *533 to have avoided the collision by the use of the means submitted in the instruction, and whether by the use of such means defendant could have avoided the collision. If the above were determined by this jury in the affirmative [which they were], the jury then had to determine whether defendant failed to use such submitted means whether the failure to use such submitted means was negligence, and, if it was, whether such negligence directly contributed to cause the collision.
This instant instruction 2 does not contain the infirmities of the instructions ruled in the Cable and Smithers and like cases. Those instructions in those named cases did in fact broaden the zone of peril as above noted for they permitted a finding of imminent peril when plaintiff was only approaching or near peril but in fact was not in peril. But this instruction 2 definitely requires that the jury find as a fact "that prior to being struck" [which was on the north half of Market] plaintiff "was in a position of imminent peril." Of course under this evidence plaintiff was not in peril when on the south half of Market, and the jury could not so understand or conclude from either the evidence or this instruction. It would have been manifest error for the instruction to have advised the jury when plaintiff came into peril. When plaintiff came into peril was a fact question for the jury. Harrington v. Thompson, Mo.Sup., 243 S.W.2d 519, Perkins v. Terminal R. Ass'n of St. Louis, 340 Mo. 868, 884, 102 S.W.2d 915, 923[13]. In the Harrington case, supra, we held that an instruction which permits the jury to determine when, or at what time and place, plaintiff came into peril "is a proper one so long as the instruction does not contain language * * * which specifically directs a jury to, or makes likely that a jury will, find that plaintiff was in a position of imminent peril at a time and place when and where he could not have been; in other words, so long as the instruction does not contain a misstatement as to where a position of imminent peril begins." In the Harrington case, 243 S.W.2d lac. cit. 525, 527, we clarified that portion of our opinion in the Cable case which is here relied upon and quoted by defendant in its instant brief.
Plaintiff walked north across the north half of Market, and it is clear that at some point while so walking she, did actually come into peril, for she was there struck. Plaintiff came into peril when she came into a place of certain danger, which was when she started walking on north from a point in front of the Ford car, oblivious to the approach of the bus and with a manifest and apparent intention to walk into the path of the bus. Frandeka v. St. Louis Public, Service Co., 361 Mo. 245, 234 S.W.2d 540, 547[12], 4 Blashfield, Cyclopedia of Automobile Law and Practice, Sec. 2844.5, page 469. The jury did not have to definitely answer any interrogatory as to when [or at what exact point or instant] it was that she came into certain danger. Under our practice the jury must find that plaintiff was in peril, and it must then determine whether such peril was in fact discoverable "in time thereafter" [i. e., whether the peril was discoverable soon enough] for defendant to have avoided the collision by the use of the means submitted in the instruction.
Defendant's contention that instruction 2 did not submit sufficient facts, or did not clearly and definitely instruct the jury as to when the defendant's duty to act arose is answered by what we have said above. Instruction 2 as here submitted made it clear that before defendant had any duty to act the jury had to find as a condition precedent thereto that plaintiff came into and was actually in a position of discoverable peril. It does not place upon defendant a duty to act before plaintiff was in peril. Under the law it is the existence of plaintiff's position of discoverable peril as a present existing fact which springs into existence the defendant's duty to act.
Defendant's above-stated contentions respecting instruction 2 are without merit.
Was the jury's verdict as approved by the trial court excessive? Stated most favorable to the verdict below it appears that plaintiff suffered: a comminuted impacted fracture [Colles] of the right wrist *534 at the distal end of the radius with a dorsal inclination of the surface of the radius; a resultant narrowing of the joint space and diminution of the movement of the bones of the joint; a transverse fracture of the styloid process of the ulna with permanent fragment separation; and some soft tissue injury and sprain to her back muscles for which she received infra-red therapy. Plaintiff's arm was in a cast and she remained in her home for 8 weeks. At trial time plaintiff's hand was somewhat fuller and larger, one wrist process was a half inch longer, with the hand extension and flexion impaired, side-to-side motion limited and her physician testified it will always be painful. Plaintiff had "about two-thirds restriction of the movement of her right wrist," some limitation of motion of fingers and will have some permanent wrist disability, but the motion in her fingers will improve with use. Plaintiff testified that "my arm hurts me mostly when it is cloudy and when I do my little work around the house." Her physician testified that in his opinion plaintiff "will have low back pains probably the rest of her life."
No special damages were shown. There was no hospitalization, no loss of earnings or wages, and no medical expenses were proved. Plaintiff was 47 years old at trial time, a housewife, and had not been working outside her home.
We have so often and so recently stated them that no useful purpose will be served by here repeating the many factors which properly enter into our consideration of whether a verdict for damages for personal injuries is excessive in amount. We have examined the cases cited by defendant, the case cited by plaintiff, and have examined and considered many other cases not cited by either party which present situations of similar and nearly similar injuries. We need not here extend this opinion to either cite or discuss those cases. No two cases are exactly alike in either injuries sustained or in after results.
And it is our conclusion from all of the above that, under instant facts and circumstances, the judgment appealed from is excessive in amount, but that the rule of uniformity will be observed if the instant judgment finally stands for $5,000.
It is, therefore, ordered that if the respondent-plaintiff will enter a remittitur of $3,000 as of the date of the judgment below, that the judgment will then be affirmed for $5,000 as of its date; otherwise the judgment will be reversed and the cause remanded for retrial. It is so ordered.
All concur.